76869. JET AIR, INC. et al. v. NATIONAL UNION FIRE INSURANCE COMPANY et al.
(375 SE2d 873)

BEASLEY, Judge.

Appellants Larry Block and Jet Air, Inc., d/b/a Planes, Inc., appeal from the grant of summary judgment to National Union Fire Insurance Company of Pittsburgh and Southeastern Aviation Underwriters, Inc. The complaint sought recovery in six counts for damages to a Learjet which skidded off the runway in Cleveland, Ohio while landing on January 26, 1983.

While there were numerous non-material factual disputes, viewing the evidence favorably to Jet Air and Block, the opponents of the summary judgment motion, there is no genuine dispute about the following material facts. OCGA § 9-11-56 (c).

Block incorporated Planes in 1962 and Jet Air in 1972. He was

president and major stockholder of both. Jet Air was incorporated for the purpose of owning aircraft which were then leased to Planes for use in commercial operations, based in Atlanta. From 1962 through 1983, Block's aviation business was continuously insured for aviation coverage. For the four years prior to the present claim, coverage was placed with National through Southeastern.

The policy, listing Block, Planes, and Jet Air as the insureds, covered the period from November 19, 1982 to November 19, 1983. The Breach of Warranty Endorsement provided that Ford Motor Credit Company, which financed the Learjet, was lien holder in the amount of $550,000. It further provided that "loss, if any, under any Physical Damage coverage provided by this policy, shall be payable to the insured, and to Ford . . . as interest may appear." For a partial loss, the policy provided that National would pay "if repairs are made by other than the Named Insured, the cost to repair the damaged property . . . (excluding any charges for overtime), . . . ."

The promissory note to Ford signed by Block as president of Jet Air, and guaranteed by him individually and by Planes, provided that insurance acceptable to Ford would be obtained and that "the policy . . . shall, by endorsement be acceptable to [Ford], provide that losses thereunder shall be first payable to [Ford] as its interest may appear, and Debtor hereby assigns to [Ford], the proceeds of all such insurance . . . to the extent of the indebtedness secured hereby, directs the insurer to make payments of any losses . . . directly to [Ford], and appoints [Ford] as Attorney-in-Fact to endorse any draft, check or other form of payment made by the insurer. . . ." The note also provided that upon default, Ford could retake possession with or without process of law and sell the collateral at public or private sale.

On December 14, 1982, Ford sent Jet Air a mailgram notice of delinquency for the payments due in October, November and December, and demanded payment by December 17. At the time of the crash in January, neither these payments nor the January payment had been made.

When it crashed, the Learjet was being piloted by an employee of Epps Air Service which had leased the plane from Planes. Epps was also insured by National. Planes' policy contained a substantial deductible and did not provide coverage for loss of use. However, a claim by Planes against Epps would potentially be covered by Epps' policy, which provided coverage without a deductible and for loss of use. A tort action against Epps is pending.

On February 1, 1983, Jet Air's balance of $610,224.13 on the note to Ford was accelerated, and Ford notified Southeastern on February 3 of repossession "in place." The plane was located at Wright Aviation, a repair facility at the Cleveland airport where the crash occurred.

Block acknowledged that the plane was not a total loss and was repairable. On February 3 he sent a letter to Wright authorizing it to inspect the damaged plane and "to make such repairs as are required to return the aircraft to serviceable condition. I will expect your damage report prior to commencement of repairs." On April 19 Ford also sent a letter to Wright giving "formal authorization" for the repairs.

The fuselage was not repaired by Wright until March, 1984 and the engines were not sent to the manufacturer for analysis and repair until late 1983. The engines were disassembled and Block's attorney was notified by copy of a letter of December 9, 1983 from Southeastern to Ford's counsel that the engines were corroded and that some if not all of the corrosion was due to the delay in repair.

Back on March 3, 1983, Planes filed for protection under Chapter 11 of the Bankruptcy Code, Title 11 USC § 1101 et seq. Prior to this, National had received a garnishment from Westinghouse, a creditor of Planes, and a Notice of Tax Levy on Planes from the I.R.S. Although Ford's note was from Jet Air, Ford did not physically repossess because Planes had claimed an interest in the plane in the bankruptcy proceedings.

Ford intervened in the bankruptcy on May 24, 1983, seeking to terminate the stay and proceed with the sale of the Learjet. On August 21, 1984, that court found that Ford had a valid security interest in the plane, "that the amount of Debtor's debt exceeds the value of such property, [and] that Debtor has been unable to afford Plaintiff adequate protection for its interest in such property, . . . ." The court modified the stay to allow Ford to take immediate possession of the plane and to direct Planes to cause it to be surrendered. Block acknowledges that it was his intent to convey the Learjet to Ford and allow Ford to sell it.

On September 21, 1984, Block for the first time notified Southeastern that he demanded settlement of the claim as a total loss, claiming the face amount of the policy, $800,000. In June 1985, Ford settled with National for $225,506.73. Block was aware of the settlement by at least June 8. Ford proceeded to sell the plane for $130,000 and credited both sums to the balance due by Jet Air. Jet Air obtained assignments of some assets of Planes from the bankruptcy, including any claims under the policy.

Jet Air and Block sued on August 13, 1986. They claimed: Southeastern and National failed to pay under the policy; defendants caused the "deterioration" of the plane by their handling of the claim; defendants contracted with Wright to have the plane repaired and told plaintiffs the repairs would be made in a timely and competent fashion, knowing these statements to be false; defendants had negligently selected Wright and negligently entrusted the plane to them; and Southeastern interfered with the contract between National and

plaintiffs. A sixth count was abandoned in the summary judgment proceedings.

1. Choses in action, including those arising under contracts, may be assigned. OCGA §§ 44-12-22; 33-24-17; 18-2-41. That is what Block and Jet Air did, to the extent of their indebtedness to Ford, by signing the Breach of Warranty Endorsement. Thus, Ford as well as Jet Air and Block had an insurable interest at the time of the loss. OCGA § 33-24-4; *Republic Ins. Co. v. Martin*, 182 Ga. App. 390, 392 (1) (355 SE2d 694) (1987).

While Block and Jet Air retained their insurable interests even after the foreclosure due to their continued liability on the note, the question is the extent to which they are entitled to recover, considering the nature of the loss and the language of the policy and the assignment.

The policy provided that, in the situation of a partial loss, the only right to recovery was the "cost to repair." Prior to the August 21, 1984 order of the bankruptcy court, Block and Jet Air had incurred no repair costs. After that time, Ford as owner of the Learjet was responsible for the costs.

As to the actual cost to repair the plane, reflected by the invoices from Wright and the manufacturer, Block and Jet Air had suffered no loss and had no right to recover under the policy as written. *McKay v. Consolidated &c. Ins. Co.*, 149 Ga. App. 691, 692 (256 SE2d 93) (1979); see *National Security &c. Co. v. Eureka Fed. Savings &c. Assn.*, 188 Ga. App. 693 (373 SE2d 811) (1988); *Cherokee Ins. Co. v. First Nat. Bank*, 181 Ga. App. 146, 147 (351 SE2d 473) (1986). They did not incur liability for the repairs. In fact, they were benefitted by the reduction of the debt to Ford in the full amount of the repair costs.

Thus, summary judgment to defendants as to recovery of this amount was not error.

2. Plaintiffs' claim that the plane was a total loss due to deterioration caused by negligent repair seeks a windfall. Although appellants lost the plane, that was due to repossession, and they did not lose the total value of the plane because of the substantial reductions in the debt to Ford which were reflected by the credits for insurance and sale proceeds of the repaired plane.

In addition, plaintiffs failed to comply with conditions precedent required by the policy.

Condition 10 provides that "[p]ayment for loss may not be required nor shall action lie against the Company unless as a condition precedent thereto, the named insured shall have complied with all the terms of this policy nor until thirty days after proof of loss is filed and the amount of loss is determined as provided in this policy, *nor at all unless commenced within twelve months after the happening*

*of the loss.*" (Emphasis supplied.)

Pretermitting the issue of failure to file a proof of loss as to the total loss claim, and assuming without deciding that the time for determining the "happening of the loss" with regard to the corrosion damage was its discovery in December 1983, plaintiffs' failure to file suit within one year is fatal to recovery on that claim. *Universal Scientific v. Safeco Ins. Co.,* 174 Ga. App. 768, 770 (331 SE2d 611) (1985); *Smith v. Allstate Ins. Co.,* 159 Ga. App. 743, 744 (285 SE2d 82) (1981).

Plaintiffs' argument that any such requirement was waived by defendants is not supported by the record as to the "total loss" claim. At no time did the insurer or its agent indicate willingness to negotiate any such claim. *Universal,* supra at 769-770; see *Carpenters Local Union &c. v. Gen. Ins. Co. &c.,* 167 Ga. App. 299 (306 SE2d 383) (1983).

3. Counts 4 & 6 deal with false representations by National and Southeastern as to the competence of Wright and negligent selection of Wright by them.

"A tort is the unlawful violation of a private legal right other than a mere breach of contract, express or implied. A tort may also be the violation of a public duty if, as a result of the violation, some special damage accrues to the individual." OCGA § 51-1-1.

The only duty owed by either defendant to plaintiffs, and the only one in any way supported by the record, is that created by the contract of insurance. Even assuming a breach of the contract, it would not amount to a tort by either National or its agent, Southeastern. *State Farm Fire &c. Co. v. Pace,* 176 Ga. App. 737, 739 (337 SE2d 401) (1985); *Smith v. United Ins. Co.,* 169 Ga. App. 751, 752 (1) (315 SE2d 265) (1984).

The evidence shows that Wright, which had the Learjet and was to repair it, was an independent contractor, whether the contract was with Southeastern or plaintiffs. There being no evidence that Southeastern exercised any control as to the time and manner of the work, it could not be liable for any negligence of Wright in repairing the plane. OCGA § 51-2-5. *Caruso v. Aetna Cas. &c. Co.,* 181 Ga. App. 829, 830 (354 SE2d 18) (1987).

Summary judgment on these counts likewise was not error.

4. Finally, count 5 alleged that Southeastern intentionally interfered with the contract of insurance between National and plaintiffs, apparently by agreeing to pay Wright for repairs, that being the only factual basis alluded to by plaintiffs.

Tortious interference with contractual relations is applicable only when the interference is done by one who is a stranger to the contract. *McDaniel v. Green,* 156 Ga. App. 549, 550 (1) (275 SE2d 124) (1980); *Piedmont Cotton Mills v. H. W. Ivey Constr. Co.,* 109 Ga.

App. 876, 879 (1) (137 SE2d 528) (1964). All of the acts of Southeastern complained of by plaintiffs were performed by Southeastern as agent for a contracting party and were within the scope of its duties as agent. OCGA §§ 10-6-1; 10-6-50; 10-6-51.

Summary judgment on that count was not error either.

*Judgment affirmed. Birdsong, C. J., and Banke, P. J., concur.*

DECIDED NOVEMBER 10, 1988 —
REHEARING DENIED NOVEMBER 29, 1988 —

*Robert M. Goldberg, Alan Z. Eisenstein,* for appellants.

*Mozley, Finlayson & Loggins, J. Arthur Mozley, Deborah A. Finnerty,* for appellees.