A91A1424, A91A1425. COHEN v. WILLIAM GOLDBERG & COMPANY, INC. et al. (two cases).
A91A1426, A91A1427. COHEN et al. v. WILLIAM GOLDBERG & COMPANY, INC. et al. (two cases).
(413 SE2d 759)

SOGNIER, Chief Judge.

Jay Cohen, the sole stockholder in the T-Shirtery, Inc., and Steve Radford, the sole stockholder in Hightower Corporation, the holding company of All-Star Imprinting, Inc., entered into negotiations to sell the stock of the T-Shirtery and All-Star to William Goldberg & Company, Inc. (WGC), whose sole stockholder was Bill Goldberg, in exchange for Jay Cohen and Radford receiving, inter alia, 37.5 and 25 percent, respectively, of WGC's stock, executive positions in WGC, and, in Jay Cohen's case, certain additional remuneration for the T-Shirtery's stock. The deal collapsed, and Jay Cohen filed suit seeking a declaration that the negotiations had failed to produce an enforceable contract, the breach of which would entitle any party to damages. Jay Cohen's father, Joe Cohen, was allowed to intervene as a plaintiff.[1] Numerous counterclaims were filed by Goldberg, WGC, Radford, Hightower, and All-Star. This opinion consolidates four appeals brought by Jay Cohen (who we will hereinafter refer to as "Cohen") and Joe Cohen from various rulings entered in the Superior Court of Fulton County.

1. The main issue in the appeals is the propriety of the trial court's ruling that genuine issues of material fact exist regarding the enforceability of the sale contract negotiated by Cohen and appellees. The pertinent facts as revealed by the record are that the T-Shirtery and All-Star were two t-shirt imprinting businesses experiencing financial difficulties. Goldberg was a business broker providing financial advice to both companies. A proposal was made in late 1985 to combine the T-Shirtery and WGC, with All-Star entering into the negotiations shortly afterwards, so that the basic concept of the proposal was that the two imprinting companies would sell some or all of their stock to WGC in exchange for a percentage of WGC stock, and

---

[1] We will refer to this party as "Joe Cohen" in this opinion although we are aware that Joe Cohen died shortly after this litigation began and his interests are now represented by the executors of his estate.

that the imprinting companies would merge essential operations with Cohen and Radford selling and marketing for their respective former companies but with WGC handling the administrative and financial arrangements.

The record is clear that when the parties and counsel met in April, the documents prepared by Goldberg/WGC's attorney, Steve Merlin, set forth terms different from those originally contemplated by the parties, especially regarding the additional remuneration Cohen was to receive for his T-Shirtery stock. By the April 23, 1986 meeting, it was agreed Cohen would receive payment for his stock in the form of deferred compensation, and that meeting concluded with Cohen's attorney, Bob Hipple, stating he would draft another version of the agreement regarding Cohen's deferred compensation for the meeting the following day.

The April 24 meeting lies at the core of this dispute. Hipple was not able to attend that meeting in person, and the parties did not review any deferred compensation documents drafted by him. The parties present at the meeting, Cohen, Goldberg (with his attorney, Merlin), and Radford (with his attorney) signed numerous documents including a shareholders' agreement, a stock exchange agreement, a management agreement, and an employment agreement between Cohen and WGC, which provided that Cohen would forfeit all remaining unpaid deferred compensation if he were fired for cause. It is uncontroverted that Cohen also signed a deferred compensation agreement ("DCA"). The copy of the DCA in the record is a typewritten document with certain handwritten interlineations. The handwritten terms provide for compensation terms less favorable to Cohen. Only Goldberg's initials appear beside the most significant handwritten changes. It is uncontroverted that Cohen signed the DCA without the handwritten interlineations.

Cohen also signed an escrow and modification agreement at the April 24 meeting. That agreement first witnessed that the parties had executed certain documents, specifically including the DCA. It then provided that the documents would be held in escrow by Merlin's firm; that the stock exchange agreement would be modified in numerous particulars; and that the parties stated that certain agreements, including the DCA, "shall become effective immediately" with the proviso that all the agreements "shall . . . terminate in the event that all of the conditions of this escrow are not satisfied." Under the caption "Additional Conditions Precedent to Release of the Escrow" were conditions requiring the delivery of: letters of opinion of counsel in form and substance satisfactory to the parties; lenders' consents; and deliveries required under Article 6 of the Stock Exchange Agreement such as the delivery of stock certificates, corporate seals, and stock record books, certifications that warranties and representations

made in the stock exchange agreement were true and correct on the closing date, the resignations of corporate officers, and corporate minutes setting forth the appointments of Goldberg, Cohen, and Radford as new directors.

Cohen moved for summary judgment on the ground that the evidence of record established as a matter of law that no enforceable contract was executed on April 24. We do not agree, and accordingly we affirm the trial court's denial of his motion for summary judgment on this issue.

(a) First, we do not agree with Cohen that the evidence conclusively established that there was no meeting of the minds of the parties on the terms of the DCA, a material part of the sale contract, so that under OCGA §§ 13-3-1, 13-3-2 no valid contract was created. Cohen uncontrovertedly signed the typewritten agreement. Although Hipple was not present at the meeting, Cohen conferred with him by telephone during the meeting, and the evidence is clear that Goldberg insisted on maintaining an arm's length relationship with Cohen during the meeting. Although Cohen deposed that he has difficulty understanding legal documents, he does not contend that he was prevented from reading the DCA or from consulting with Hipple regarding its terms. See generally *Fore v. Parnell-Martin Cos.*, 192 Ga. App. 851, 852 (1) (386 SE2d 723) (1989). Moreover, while the parties were anxious to complete the transaction, the evidence uncontrovertedly establishes that the behavior of the parties was not such that Cohen's signature on the DCA was coerced. See *Tidwell v. Critz*, 248 Ga. 201, 203-204 (1) (282 SE2d 104) (1981). The record thus establishes that Cohen, by signing the unaltered, typewritten DCA, assented to its terms.

Although parol evidence may be used to show no valid agreement ever went into existence, *Citizens &c. Nat. Bank v. Williams*, 147 Ga. App. 205, 207-208 (4) (249 SE2d 289) (1978), it cannot be used to contradict or vary the terms of a valid written agreement. Id. Cohen's deposition testimony regarding his understanding that even after signing the documents, Hipple's review of the documents was necessary before they could be considered final was not evidence regarding the parties' meeting of the minds, but instead was evidence that the executed documents were subject to Hipple's modifications notwithstanding Cohen's acceptance, and accordingly constituted inadmissible parol evidence.

(b) Second, a clear question of material fact exists whether Goldberg assented to the terms of the typewritten DCA.[2] The evi-

---

[2] We reject Jay Cohen's argument that Goldberg admitted in responsive pleadings that he was seeking to enforce the DCA *with the interlineations* merely because Goldberg referred in his pleadings to the DCA in the escrow file. He later clarified it was the unaltered

dence conflicted whether Goldberg accepted the typewritten agreement by signing it, as Goldberg and Merlin deposed, or whether Goldberg rejected the typewritten agreement by inserting material handwritten changes before signing the document, as Cohen deposed. We note that although Radford and his attorney deposed that they did not observe this aspect of the transaction, Radford's attorney wrote Merlin the following day that the DCA was an issue "left open with respect to the closing."

The conflicting evidence raises the possibility that while Cohen, by signing the typewritten agreement, accepted the offer on the terms set forth, Goldberg responded by inserting the material handwritten changes in the terms, thereby constituting a counteroffer. See *State of Ga. v. U. S. Oil Co.*, 194 Ga. App. 1, 2 (389 SE2d 498) (1989). Since it is uncontroverted that Cohen did not initial the changes, if it is established that the typewritten agreement without interlineations was not executed by both parties, Cohen's refusal to accept the counteroffer would mean there was no sale contract.

(c) The parties place great emphasis on the actions of the parties regarding the DCA after the April 24th meeting. Basically, this evidence reflects that while Cohen accepted the unaltered typewritten agreement (which, together with the employment agreement, provided that his deferred compensation, payable in four years with no limitations based on net profits, would be forfeited should he be fired for cause), he rejected the handwritten proposals in the DCA as well as other subsequently proffered terms made by Goldberg (which provided that payment for his deferred compensation would be spread over a minimum of ten years or longer because of net profit requirements), unless the clause authorizing forfeiture of the payments upon his discharge for cause was eliminated. While other aspects of the transaction were modified by written agreement of the parties after April 24, the record establishes that no subsequent proposal concerning the DCA was accepted by both Cohen and Goldberg/WGC. Accordingly, the evidence establishes that the typewritten DCA, without its interlineations, was the only version of that document that possibly could have been executed by the parties. Although the actions of Cohen and Hipple after April 24 appear consistent with Cohen's claim that no DCA was executed, that does not control the issue whether any issues of fact exist. Rather, it appears that the actions of the parties after April 24 regarding the DCA were either proposed modifications of an existing agreement or continued negotiations toward executing a first DCA, language in the escrow agreement notwithstanding.

---

typewritten version of that agreement in the escrow file that he was seeking to enforce.

(d) Although Cohen argues that the sale contract was not valid because it was not sufficiently definite (blanks were left in the management agreement), the record establishes that he was fully prepared to go forward with the sale contract (but for the DCA) notwithstanding the offending blanks. Further, the deposition testimony of all the parties, including Cohen, reveals that they did not consider the subject matter of these blanks to be significant. Thus, we do not agree with Cohen that the blanks in the management agreement constituted an essential part of the contract upon which the minds of the parties had not met or upon which there was not an agreement so as to give rise to a valid and binding contract. Compare *Kole v. Linkenhoker*, 196 Ga. App. 124 (1) (395 SE2d 378) (1990); *Jackson v. Easters*, 190 Ga. App. 713, 714-715 (1) (379 SE2d 610) (1989). Furthermore, we note that " '[i]f a writing is signed with blanks left to be filled in by the other party, the person signing is bound by it. [Cit.]' [Cit.]" *Fore*, supra at 853 (2).

(e) We do not agree with Cohen that there was no valid sale contract until the escrow closed. The argument Cohen raises is basically that even assuming, arguendo, that the unaltered, typewritten DCA was executed and Cohen then informed appellees he would not abide by the terms of that agreement, his actions did not constitute a "breach of contract" as alleged in appellees' counterclaims because no contract had been formed and would not be formed until all the documents required for the transaction were in the escrow file within the time specified. We do not agree with Cohen that he could repudiate a promise he made in a contract and then use that repudiated promise as the basis for asserting that no contract had ever been created. A party cannot promise to sell a car for $50 and then claim, upon his failure to deliver the car to the purchaser at the agreed place and time, that his own nonperformance of his duty under that promise meant no agreement had been made in the first place. The "conditions" to be fulfilled at the closing of the escrow — i.e., the delivery of corporate seals, stock, and papers verifying the truth of what the parties had already promised, etc. — were not conditions of the duties the parties had assumed but were the first steps in performing those duties as promised. See *First Nat. Bank v. Nat. Bank of Ga.*, 249 Ga. 216, 217-218 (1) (290 SE2d 55) (1982). Because the "Additional Conditions Precedent" in the escrow agreement did not qualify the parties' acceptance of the contract but instead manifested what the parties had represented in the contract, see 1 Williston, The Law of Contracts, § 78 (3rd ed. 1957), we do not agree with Cohen that the mere existence of the escrow requirements in the context of this transaction meant there was no contract extant for Cohen to breach.

(f) However, given the uncontroverted evidence that the escrow file, which contained all documents compiled by the escrow agent, did

not contain a number of the items required to satisfy the escrow agreement, and after reviewing appellees' answers and particularly the depositions of Radford and his attorney, we conclude that a question of fact exists whether the parties abandoned their performance of the escrow agreement in direct response to Cohen's alleged breach of the sale contract, see OCGA § 13-4-23, or whether the failure to satisfy the escrow agreement was so unrelated to the dispute over the DCA as to constitute an independent basis for holding that the sale contract terminated, per the escrow agreement provision, because the escrow file was never completed.

2. We agree with appellant Joe Cohen that no question of fact exists whether he was a contracting party to the April 24 agreements allegedly executed by his son, Cohen, and appellees. It is uncontroverted that Joe Cohen signed none of the agreements and that no party at the April 24 meeting had actual or apparent authority to act on Joe Cohen's behalf. Since the agreements signed included a transfer of real property and matters which were not to be performed within one year from the making of the agreements, any attempt by appellees to include Joe Cohen as a contracting party to the transaction must fail under OCGA § 13-5-30 (4) and (5). Thus, to the extent the trial court's order on Joe Cohen's motion for summary judgment addressed appellees' claim that Joe Cohen was obligated under the contract, the denial of the motion on this issue was error.

3. The trial court denied the motion for summary judgment by Joe Cohen made on the ground that he was not liable for tortious interference in the sale contract. We disagree and reverse. In doing so, we do not rely on Joe Cohen's argument that appellees cannot recover for the alleged interference because the underlying contract was unenforceable, see, e.g., *Shanco Intl., Ltd.* v. *Digital Controls*, 169 Ga. App. 184, 186 (2) (312 SE2d 150) (1983), nor do we give credence to appellees' argument that Joe Cohen, who did not sign any aspect of the contract, was somehow rendered a party thereto. See OCGA § 13-5-30 (4), (5); Div. 2, supra. Instead, we conclude that he was an intended beneficiary of the sale contract and as such cannot be subject to appellees' tortious interference claim.

The record reveals that Joe Cohen had executed a letter of credit to the T-Shirtery's lender in January 1986 in order to help his son, Cohen, obtain the financial backing necessary to keep the T-Shirtery in business. Although a security agreement was thereafter executed entitling Joe Cohen to recover the principal and interest on the letter of credit plus $5,000 upon certain conditions of default, it does not appear that Joe Cohen received any payment from his son or the T-Shirtery merely for extending the letter of credit. The result of the contract between Cohen and appellees, however, was that instead of extending a letter of credit to a corporation wholly owned by his son,

Joe Cohen's letter of credit would be benefitting a corporation wholly owned by WGC, a corporation in which his son had only a 37.5 percent interest. Thus, a provision was inserted in the shareholders' agreement authorizing the payment of $600 a month to Joe Cohen so long as the T-Shirtery utilized Joe Cohen's letter of credit, notwithstanding anything to the contrary in the sale contract executed by Cohen, the T-Shirtery, and appellees.

The record establishes that the parties to the sale contract intended that Joe Cohen should be the direct beneficiary of this provision, a position which granted Joe Cohen the standing to enforce the contract under OCGA § 9-2-20 (b). Compare *Bartley v. Augusta Country Club*, 172 Ga. App. 289, 290 (322 SE2d 749) (1984); *Donalson v. Coca-Cola Co.*, 164 Ga. App. 712, 713-714 (2) (298 SE2d 25) (1982). It thus appears that appellees are claiming that a third-party beneficiary of the contract was tortiously interfering in the very contract under which he was to receive a benefit. Although we have held that an intended beneficiary may assert a claim of tortious interference against a third party who infringes upon the beneficiary's rights under a contract, *Rouse v. Crum*, 169 Ga. App. 439, 441 (313 SE2d 140) (1984), research has not disclosed a situation in which a claim of tortious interference with contractual relations has been made against an intended beneficiary to that contract. It is well established, however, that "[t]ortious interference with contractual relations is applicable only when the interference is done by one who is a stranger to the contract. [Cits.]" *Jet Air, Inc. v. Nat. Union Fire Ins. Co.*, 189 Ga. App. 399, 403-404 (4) (375 SE2d 873) (1988). Applying that principle here, we hold that because Joe Cohen was an intended beneficiary of the contract, he was not a "stranger to the contract" since he was legally authorized to enforce the contract under OCGA § 9-2-20 (b). Accordingly, appellees' claims against him for tortious interference fail as a matter of law. The trial court erred by denying Joe Cohen's motion for summary judgment as to appellees' claims against him for tortious interference with contractual relations.

4. Joe Cohen enumerates as error the trial court's denial of his motion in limine. Although there are 7,900 pages of record in this five-year litigation, Joe Cohen does not provide a record reference to any court order denying this motion as required by Court of Appeals Rule 15 (c) (3). The trial court's December 5, 1990 order denying Joe Cohen's motion for summary judgment does not reference any motion in limine. However, the arguments in his brief indicate that the trial court's ruling denying Joe Cohen's motion for summary judgment on the tortious interference claim implicitly denied his motion to limit introduction of evidence of damages suffered as a result of the alleged tortious interference. Thus, it appears that our holding in Division 3 that Joe Cohen was entitled to summary judgment on the tortious

interference claim resolves this enumeration as well.

5. The trial court in its December 12, 1990 order granted cross motions for partial summary judgment that eliminated from the litigation all claims arising out of alleged violations of federal and state securities laws. The order addressed only these securities claims; we note that the judgments on the pleadings entered against appellants on December 5, 1990 did not encompass these claims.

Pretermitting all questions regarding the validity and consummation of the sale contract, we find no error in the trial court's grant of appellees' motion for summary judgment on the securities claims. To determine whether the WGC stock contemplated under the sale contract constituted a "security" under either the Georgia Securities Act of 1973, OCGA § 10-5-1 et seq., or the federal securities acts, we apply the test in *Landreth Timber Co. v. Landreth,* 471 U. S. 681, 685-686 (105 SC 2297, 85 LE2d 692) (1985), which is whether the stock "bears such characteristics usually associated with common stock that a purchaser justifiably may assume that appropriate securit[ies] laws apply." *Henderson v. KMSystems, Inc.,* 188 Ga. App. 893, 897 (374 SE2d 550) (1988). Substantially similar to the situation in *Henderson,* the parties sub judice signed a shareholders' agreement which provided in pertinent part that each certificate would contain a notice stating (1) that the stock was subject to the conditions in the shareholders' agreement (such as restrictions on transfer without WGC's prior written consent and the right of WGC to repurchase the stock upon the shareholder's death, retirement, or termination) and (2) that the stock was not registered under the federal or Georgia securities acts and could not be sold or otherwise transferred unless the securities were registered. Accordingly, because of the substantial impairment on the negotiability of the stock which the conditions presented and the express negation of any assumption that the Georgia or federal securities acts applied, the stock here, as in *Henderson,* did not meet the statutory definition of "security" under either the Georgia or federal securities act. Id.

A stock not meeting the definition of a security under the test in *Landreth Timber Co.,* supra, may otherwise come within the Georgia or federal securities acts if the stock qualifies as one of the "unusual instruments" not easily characterized as "securities." Id. at 690; *Henderson,* supra. To make this determination, we apply the economic reality test in *Securities &c. Comm. v. W. J. Howey Co.,* 328 U. S. 293 (66 SC 1100, 90 LE 1244) (1946); *Landreth Timber Co.,* supra at 689, which is likewise applicable to Georgia's securities act. *Tech Resources v. Estate of Hubbard,* 246 Ga. 583 (272 SE2d 314) (1980); *Henderson,* supra at 897-898 (2). " '[T]he touchstone (of a security) is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the en-

trepreneurial or managerial efforts of others.' [Cit.]" *Tech Resources*, supra at 584. "[T]here must be an investment, a reasonable expectation of profits, and a reliance on the management of another party to bring about the profits." Id. at 585. The evidence in the case sub judice established that had the sale contract contemplated by the parties been performed, Cohen would have exchanged his T-Shirtery stock for 37.5 percent of WGC stock and positions as WGC's vice-president of marketing and one of three members of WGC's board of directors. Cohen's duties in WGC clearly would have placed him in control of many essential income-generating decisions from which he, as an investor, would expect profits to flow. See *D. K. Properties v. Osborne*, 143 Ga. App. 832, 835-836 (1) (240 SE2d 293) (1977). "[Cohen's] investment relied upon and expected returns based upon [his] own efforts and not solely those of another. [Cits.] . . . [Cohen's] involvement in the business here was not merely 'token' involvement ([cits.]), and assuredly under the undisputed evidence [he] did not look solely to the efforts of [appellees] for enhancement of [his] investment and the ultimate success of the business. [Cit.] Accordingly, [he] has no claim for violations of the [securities acts] in the sale of securities . . . and no concomitant claim for attorney fees under [OCGA] § 10-5-14." *Nicholson v. Harris*, 179 Ga. App. 35, 36 (345 SE2d 63) (1986). See also *Tech Resources*, supra at 585.

Given that the underlying transaction did not qualify as a securities transaction, we need not determine whether Joe Cohen was a party to that transaction so as to have standing to assert violations of the state and federal securities laws against appellees.

6. The other major issue in the appeals is the effect of the dismissal with prejudice of all claims by and against the T-Shirtery (based on the bankruptcy court's settlement of the T-Shirtery's estate) on appellants' remaining claims. However, the procedural status of the trial court's rulings on this issue (in the form of judgments on the pleadings and grants of summary judgment) precludes us from reaching the heart of the parties' arguments.

(a) Both Cohen and Joe Cohen appeal from judgment on the pleadings entered against each of them on December 5, 1990. In the December 5th judgments the trial court, after referencing requests by appellees for judgment as a matter of law dismissing both appellants' claims, entered judgment on the pleadings pursuant to OCGA § 9-11-12 (c) in favor of appellees and against Cohen on his claims of mismanagement, breach of fiduciary duty, fraud, conspiracy, intentional infliction of emotional distress, attorney fees under OCGA § 13-6-11, and damages, and against Joe Cohen on his claims arising out of the enforceability of his security agreement in property of the T-Shirtery, ownership of T-Shirtery stock, fraud, breach of fiduciary duty, and damages. We note that these judgments were expressly included in

appellants' appeals in Case Nos. A91A1424 and A91A1427 from the trial court's grant of partial summary judgment addressed in Division 5, supra. Because the December 5th judgments adjudicated fewer than all claims, they were not final judgments and would have required compliance with either OCGA § 9-11-54 (b) or OCGA § 5-6-34 (b), see *Whiddon v. Stargell*, 192 Ga. App. 826, 827 (386 SE2d 884) (1989), had not OCGA § 5-6-34 (d) authorized their inclusion in appellants' direct appeals from the grant of partial summary judgment. OCGA § 9-11-56 (h).

Appellants contend that the trial court's entry of the December 5th judgments on the pleadings was error. There was no motion filed by appellees expressly requesting judgment on the pleadings, although it does not appear that the trial court was acting ex mero muto because of language in the judgments that the rulings were in response to requests by appellees. Thus, we need not decide whether, as with summary judgment, a judgment on the pleadings may be granted to a party who has not even moved for it. *McKay v. Nally*, 173 Ga. App. 372 (1) (326 SE2d 560) (1985). However, while our review of the record reveals two different types of motions filed by appellees requesting dismissal of appellants' complaints, it does not matter which of these motions was the source of the trial court's December 5th judgments since we agree with appellants that entry of those judgments was error.

First, the record presents the possibility that the December 5th judgments were in response to motions made in appellees' responsive pleadings requesting the trial court to dismiss appellants' complaints based on appellees' defenses of failure to state a cause of action upon which the relief sought could be granted. See OCGA § 9-11-12 (b) (6). Such motions were properly a part of appellees' responsive pleadings. *Henderson v. Fulton County Bd. of Registration &c.*, 231 Ga. 173, 175 (1) (200 SE2d 739) (1973). However, pretermitting the issue whether a motion to dismiss the complaint pursuant to OCGA § 9-11-12 (b) (6) can properly invoke a ruling on judgment on the pleadings under OCGA § 9-11-12 (c), neither the December 5th judgments nor the record indicates that a motion for preliminary hearing under OCGA § 9-11-7 (b) was filed, as required when a motion pursuant to OCGA § 9-11-12 (b) is raised in an answer, or that the preliminary hearing required by OCGA § 9-11-12 (d) was held. *Hayes v. Superior Leasing Corp.*, 136 Ga. App. 98 (220 SE2d 86) (1975). Nor can the motion for summary judgment filed by appellees on November 21, 1990 be considered an adequate replacement for the required motion for preliminary hearing both because of its content, compare *Hayes*, supra at 100-101, and the difference in the procedural requirements between OCGA § 9-11-56 and OCGA § 9-11-12 (c).

It is apparent that appellants had no advance notice that the

trial court would rule on appellees' motions to dismiss and were not afforded a reasonable opportunity to present all materials made pertinent to the motion. Under these circumstances, the judgments on the pleadings against appellants were procedurally defective and the trial court should not have entered the judgments on the pleadings dismissing appellants' complaints. See *Goodwin v. First Baptist Church of Augusta*, 226 Ga. 524, 525-526 (1) (175 SE2d 868) (1970).

Second, it is possible, as the parties assert, that the judgments on the pleadings were in response to the November 21st motion for summary judgment, filed only two weeks before the December 5th judgments were entered. There is no statutory authority for a trial court to treat a motion for summary judgment as one for judgment on the pleadings merely by excluding from consideration all matters outside the pleadings. Compare OCGA § 9-11-12 (b), (c) (motions to dismiss or for judgment on pleadings treated as summary judgment motions where matters outside pleadings are presented to and considered by court). However, even if the parties' supposition is correct that the trial court did convert the motion for summary judgment into judgments on the pleadings and assuming, arguendo, such a conversion was proper, we find that the judgments nevertheless must be reversed.

Appellants contend that the trial court's conversion of the summary judgment motion into OCGA § 9-11-12 (c) judgments was improper because the judgments on the pleadings were rendered less than 30 days after the motion was filed, see OCGA § 9-11-56 (c); USCR 6.2, thereby depriving appellants of their right to respond. See generally *Leverich v. Roddenberry Farms*, 253 Ga. 414 (321 SE2d 328) (1984). While we note that the entry of summary judgment without allowing the full 30 days to respond is not always reversible error when the record establishes that summary judgment was proper as a matter of law, so that the respondents could show no harm resulting from the procedural error, see *Leverich*, supra; *Ramsey Winch Co. v. Trust Co. Bank*, 153 Ga. App. 500, 502 (4) (265 SE2d 848) (1980), that analysis does not avail appellees since the procedural status of a judgment on the pleadings precludes us from addressing matters outside the parties' pleadings, such as the dismissal with prejudice of claims for and against the T-Shirtery. Thus, only if the pleadings alone established as a matter of law that entry of judgment under OCGA § 9-11-12 (c) was proper could a procedural error be pretermitted. In the case sub judice, even pretermitting the lack of 30 days notice, it is clear that the trial court's grant of judgments on the pleadings was improper because taking as true the material allegations of appellants' complaints, it could not be said that their pleadings failed to state causes of action or otherwise affirmatively show no claims in fact existed. See *Bacon v. Liberty Mut. Ins. Co.*, 198 Ga.

App. 436 (401 SE2d 625) (1991); *Holzman v. Nat. Bank of Ga.*, 144 Ga. App. 710 (1) (242 SE2d 299) (1978). Accordingly, the trial court erred by entering the December 5th judgments.

(b) We next consider the same trial judge's grant of summary judgment to appellees[3] in two orders, dated December 21, 1990 and filed January 3, 1991, on the identical grounds as those set forth in the December 5th judgments on the pleadings. We note that although appellants' notices of appeal in Case Nos. A91A1424 and A91A1427 (see Division 6 (a), supra) were filed December 14, 1990, it is not necessary to determine whether the express inclusion of the December 5th judgments as among those orders being included in the appeals meant that the filing of those notices acted as supersedeas to prevent the trial court from entering the January 3rd orders, see generally *Aetna Cas. &c. Co. v. Bullington*, 227 Ga. 485 (1) (181 SE2d 495) (1971); *International Images v. Smith*, 181 Ga. App. 543, 544 (352 SE2d 846) (1987), because appellants did not pay costs until March 1991 and a notice of appeal does not serve as a supersedeas to deprive the trial court of jurisdiction over the case until all costs have been paid. *Duncan v. Ball*, 172 Ga. App. 750, 751 (1) (324 SE2d 477) (1984).

It does not appear that the January 3rd orders were in response to any motion to reconsider or revise the December 5th judgments. Compare *MARTA v. Gould Investors Trust*, 169 Ga. App. 303, 306-307 (2) (312 SE2d 629) (1983). While an interlocutory judgment is subject to revision at any time before the entry of final judgment, OCGA § 9-11-54 (b); *Union &c. Co. v. Trust Co. Bank*, 143 Ga. App. 715, 716-717 (240 SE2d 100) (1977), rev'd on other grounds, 241 Ga. 343 (245 SE2d 297) (1978), the January 3rd orders do not demonstrate the exercise of the trial court's power to revise, correct, revoke, modify, amend, or vacate the December 5th judgments. See id.; *McCoy Lumber Co. v. Garland Lumber Sales*, 182 Ga. App. 75, 76 (354 SE2d 686) (1987). Instead, in executing the January 3rd orders, the trial court struck proposed paragraphs vacating and setting aside those earlier judgments. Furthermore, given the trial court's express recitation in the December 5th judgments that it excluded consideration of all matters outside the pleadings and the difference in procedural status between judgments on the pleadings and summary judgments, compare *Bacon*, supra at 436 with *Reeves v. J. M. Givan Co.*, 197 Ga. App. 617, 618 (398 SE2d 765) (1990), it cannot be said that the January 3rd orders on summary judgment were mere clerical corrections of the December 5th judgments on the pleadings, see OCGA

---

[3] Cohen and Joe Cohen appeal from the January 3rd orders in Case Nos. A91A1425 and A91A1426.

§ 9-11-60 (g), or a mere clarification of the earlier orders. See *Davis v. Davis*, 250 Ga. 206, 207 (296 SE2d 722) (1982).

" 'Where jurisdiction exists both of the subject matter and of the parties, as well as jurisdiction to make the particular order in question, an order is not void, but voidable, however erroneous or irregular it may be.' [Cit.] Thus, the court's [December 5th judgments on the pleadings were] not void, but merely voidable. [Cit.] A voidable or erroneous order cannot be disregarded; it is valid and enforceable until set aside. [Cit.] Moreover, unlike a void order, a merely erroneous order will support rights, remedies and proceedings predicated thereon. [Cit.]" *Golden Key &c. Lounge v. Key &c. Corp.*, 137 Ga. App. 251, 252-253 (2) (223 SE2d 284) (1976). Since the December 5th judgments were valid and conclusive as to the issues raised therein unless and until set aside, and the trial court did not exercise its inherent power to set aside those judgments while they were still in the breast of the court, see generally *Sunn v. Mercury Marine*, 166 Ga. App. 567, 568 (305 SE2d 6) (1983), the January 3rd orders were of no effect and are therefore vacated. Accordingly, we need not consider appellants' argument that entry of the December 5th judgments adversely affected the 30 day notice period they were entitled to receive under OCGA § 9-11-56 (c) to respond to appellees' motion for summary judgment as to those matters for which the procedural deficiency was not harmless error. See *Ramsey Winch Co.*, supra.

Therefore, because the December 5th judgments on the pleadings are reversed and the January 3rd orders are vacated, the viability of appellants' remaining claims remains for adjudication by the trial court.

7. Cohen contends error in the trial court's order realigning appellants as the defendants in this case. We note that although Cohen's notices of appeal were filed prior to the entry of the March 1991 realignment order, the appeals were docketed in this court in May 1991 and the error addressing the March 1991 order was raised on appeal of the appealable order. Accordingly, we have jurisdiction to address this enumeration. See *Vowell v. Carmichael*, 235 Ga. 410 (219 SE2d 735) (1975).

A trial court has the discretion to realign the parties at any stage of the action and on such terms as are just. *Cawthon v. Waco Fire &c. Co.*, 259 Ga. 632, 633 (386 SE2d 32) (1989). The trial court's exercise of that discretion will not be controlled unless it is abused. Id. at 634. Unlike the situation in *Cawthon*, supra, in which the appealing party demonstrated that the trial court's realignment was an abuse of discretion because of the harm (in the form of the allocation of jury strikes) which resulted from the trial court's decision, Cohen has failed to demonstrate how the realignment of the parties constituted an abuse of the trial court's discretion here. Accordingly, we will not

reverse the trial court's exercise of its discretion.

*Judgments affirmed in part and reversed in part in Case Nos. A91A1424 and A91A1427. Judgments vacated in Case Nos. A91A1425 and A91A1426. McMurray, P. J., and Andrews, J., concur.*

DECIDED NOVEMBER 19, 1991 —
RECONSIDERATIONS DENIED DECEMBER 4, 1991 — 

*Powell, Goldstein, Frazer & Murphy, Frank Love, Jr., William G. Leonard, James D. Meadows,* for appellants.

*Bedford, Kirschner & Venker; Andrew R. Kirschner, Gambrell, Clarke, Anderson & Stolz, Irwin W. Stolz, Jr., Seaton D. Purdom,* for appellees.