Larry MOORE, Plaintiff,

v.

SCOTTSDALE INS. CO., Defendant.

No. 5:92–cv–343–2 (WDO).

United States District Court,
M.D. Georgia,
Macon Division.

July 18, 1995.

Francis Nearn Ford, Eatonton, GA, for Larry Moore.

John P. Reale, Robert L. Welch, Atlanta, GA, for Scottsdale Ins. Co.

David S. Thomson, Athens, GA, for Rod Seymour.

**614**

## ORDER

OWENS, District Judge.

Before the court is defendant's second summary judgment motion, filed in the wake of this case's remand from the Eleventh Circuit. This court granted defendant's first summary judgment motion. As a matter of law, the court held that defendant had canceled the property insurance policy at issue prior to the fire that damaged the building that had at one time contained plaintiff's then-defunct business. From that order plaintiff appealed. The Eleventh Circuit certified to the Georgia Supreme Court the issue of whether the evidence adduced by defendants was sufficient to prove, as a matter of law, that notice of cancellation had been sent.

The Georgia Supreme Court reached a conclusion different from this court on the cancellation issue, precipitating the Eleventh Circuit to reverse and remand the case. Defendant now seeks summary judgment on grounds not addressed in the first order— that foreclosure of plaintiff's interest by the senior mortgagee after the loss precludes recovery under the terms of the policy, or, that the claim is barred by reason of plaintiff's undisclosed assignment of his interest in the subject property.

After careful consideration of the arguments of counsel, the relevant caselaw, and the record as a whole, the court issues the following order.

## I. FACTS

Although he had no experience in the food service or "club" industry, Larry Moore had always wanted to own "a night club, a restaurant/lounge" type business. (Moore, at 15). Notwithstanding his lack of prior experience, and the absence of any partners who did possess such experience, Moore was able to convince a good friend's father, Mr. Randy Jackson, to finance his dream. (R. Jackson, at 12). Jackson was a businessman with diverse interests. At one time or another, he has operated a resort, dealt in real estate, owned a Ford dealership, and done construction. Jackson, age forty-eight (48) during this time, had been as a father to Moore, and had even "helped raise" Moore as a young man, even paying for part of his education. At the time of these events, Moore was around twenty-seven (27) years of age.

The purchase price for the building to house "RJ's on the Lake", as Moore's restaurant/club would come to be known, was around $240,000. At least $175,000 of this was financed by People's Bank of Eatonton ("PBE"), which took a note co-signed by Moore and Jackson. The some $60,000 remainder of the purchase price was financed by seller and Central & Southern Bank of Greensboro ("CSB"), which took a position junior to that of PBE. Jackson also personally loaned Moore, in addition to co-signing the PBE note, $150,000, for which Moore gave Jackson a note. As will be discussed later, Jackson obtained the money to loan Moore from his car dealership. Jackson also steered Moore towards other investors such as Don Martin, who loaned him $175,000. The dollar figure for total start-up costs (including property, renovations, etc.) is unclear, although Moore said that renovations were over $500,000.

RJ's was ready for business by March or April of 1991. For several months the operation was "a great success." (Moore, at 40). Moore had live music, and people would come from throughout middle Georgia to patronize his establishment. Then, adjacent landowners tired of live music, or music of any type. Complaints by them led the county commission to pass an ordinance forbidding bands and music of any type. RJ's was out of business within four to six weeks, around September or October of 1991.

Moore then obtained an insurance policy on the property from Scottsdale Insurance Company on December 17, 1991, supplanting a policy that was to have been in force from April 4, 1991 through April 4, 1992. Premium payments were to be made to Siuprem, a premium finance company. If Moore (d/b/a/ RJ's on the Lake) failed to pay installments, Siuprem had power of attorney to cancel the insurance policy with Scottsdale. RJ's made two payments, the last in February 1992. When Moore's account was sufficiently past due, Siuprem undertook to cancel the policy by mailing notices of intent to cancel and

cancellation to Moore. *See Moore v. Scottsdale Ins. Co.*, 264 Ga. 808, 450 S.E.2d 198 (1994) (answering certified question regarding efficacy of cancellation notices). These notices would eventually be deemed ineffective, however, so that the policy remained in force. *Id.*

The policy insured against fire loss up to $525,000. The insurance policy contains the following clauses, each of which is material in light of the theories asserted by Scottsdale.

1. Scottsdale "does insure the insured named above and legal representatives, to the extent of the actual cash value of the property at the time of loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after such loss, without allowance for any increased cost of repair or reconstruction by reason of any ordinance of law regulating construction or repair, and without compensating for loss resulting from interruption of business or manufacture, nor in any event for more than the interest of the insured...."

2. "Assignment of this policy shall not be valid except with the written consent of [Scottsdale.]"

3. "This entire policy shall be void if, whether before or after a loss, the insured has wilfully concealed or misrepresented any material fact or circumstance concerning the insurance or the subject thereof or the interest of the insured therein, or in the case of any fraud or false swearing by the insured relating thereto."

4. "Unless otherwise provided in writing added hereto, this company shall not be liable for loss occurring—(a) While the hazard is increased by any means within the control or knowledge of the insured."

(Defendant's Brief in Support of Summary Judgment filed 4/20/93, exh. B).

During all of this, Jackson was the owner of Greensboro Ford. The Ford products in which Jackson dealt were financed by Chrysler Credit Corporation ("CCC"). The money Jackson loaned to Moore had, in fact, come from the Ford dealership. This money had been provided to Greensboro Ford by CCC. As a result of this, CCC decided to take a position in RJ's as security for its money. In Scottsdale's words:

> [On] January 7, 1992, Larry Moore, the owner of the subject property, granted a security interest in the property to Chrysler Credit Corporation to secure a debt in the amount of $487,131.95 owed by Greensboro Ford, Inc. and Randolph G. Jackson to Chrysler, both strangers to the insurance contract between R.J.'s on the Lake, Inc. and Scottsdale.

(Defendant's Undisputed Facts, ¶ 6). Moore's rejoinder, by way of affidavit, was that he "retained possession and control of the premises ... [, and] never assigned any insurance policy to Chrysler Credit Corporation." (Moore Aff., ¶¶ 3–4). The debts secured thereby were "obligations of Greensboro Ford, Inc. and Randolph G. Jackson to Chrysler Credit Corporation." (Defendant's Brief in Support of Summary Judgment, exh. C). Greensboro Ford went out of business sometime during December 1991, just before the deed to secure debt was made. (R. Jackson, at 7).

Moore leased the premises on January 15, 1992. The lessees, Theresa Minchey and Terry Fletcher, operated the lounge, the restaurant, and their real estate office therein. However, any and all rents collected by Moore during this period were not realized, as most went to repairs and maintenance.

Then, on May 29, 1992, fire destroyed the building that had formerly contained RJ's on the Lake. Since that time, no business has operated on the premises; no repairs have been undertaken, nor has anyone been contacted to do so; no maintenance, save a tarp placed by PBE to prevent further water damage, has been done; and finally, no attempt has been made to estimate the amount of damage done.

Moore later filed a chapter 11 bankruptcy to stop PBE from foreclosure on the property. The petition was voluntarily dismissed, however, when Moore realized that there was really no reason to stop the bank from fore-

closing on the building. That foreclosure eventually occurred in March 1993. PBE bought in at its own foreclosure sale. The sale has subsequently been confirmed by the superior court.

## II. DISCUSSION

### A. Arguments of the Parties—Generally

Defendant Scottsdale asks the court to consider two grounds that it believes entitle it to summary judgment. First, defendant would have the court find that there has been a foreclosure of the property by PBE prior to any repair, thereby extinguishing plaintiff's interest in the property. Defendant cites *McKay v. Consolidated American Ins. Co.*, 149 Ga.App. 691, 256 S.E.2d 93 (1979), for the proposition that foreclosure of an insured's interest in property—when the amount of the insurer's liability is limited to cost of repair—precludes recovery under the policy where that foreclosure occurs prior to making repairs.

Second, defendant argues that plaintiff's undisclosed assignment to CCC by means of the deed to secure debt voided the policy. Based on the terms of the insurance agreement between the parties, defendant classifies the assignment as one of those acts which constitutes an increased "hazard" by "means within the control or knowledge of the insured". *See Canal Ins. Co. v. P & J Truck Lines*, 145 Ga.App. 545, 244 S.E.2d 81 (1978); Defendant's Brief of 4/20/93, exh. B (insurer not liable under subject policy where hazard increased by "any means within the control or knowledge of the insured"). Defendant alternatively points to the common law rule that a material increase in an insurer's risk relieves it of liability. *See James v. Pennsylvania General Ins. Co.*, 167 Ga.App. 427, 306 S.E.2d 422 (1983); *see also Schroeder v. Georgia Farm Bureau Mutual Ins. Co.*, 211 Ga.App. 302, 439 S.E.2d 18 (1993) (increased risk need not be proximate cause of loss). Finally, defendant cites several cases to the effect that transfer of title to the insured property by the insured voids the

policy as a matter of law. *See, e.g., Higdon v. Georgia Farm Bureau Mut. Ins. Co.*, 204 Ga.App. 192, 419 S.E.2d 80 (1992); *Republic Ins. Co. v. Chapman*, 146 Ga.App. 719, 247 S.E.2d 156 (1978).

Plaintiff has responded by attempting to distinguish the primary cases cited, and filing an affidavit from Larry Moore to the effect that he remained in possession of the premises at the time of loss, and that he has never *assigned* the policy to CCC. The court will address each of defendant's contentions in turn.

### B. Foreclosure Prior to Repair

Defendant first argues that the fact of foreclosure in this case entitles it to summary judgment. Specifically, defendants point to the *McKay* case, in which plaintiff sued its insurer under the terms of a homeowner's fire insurance policy. Plaintiff's newly purchased, but as yet unoccupied, home had suffered damage covered by the policy. Before repairs were undertaken, the mortgagee foreclosed, and *"no confirmation or deficiency proceeding was subsequently undertaken."* *McKay*, 256 S.E.2d at 93 (emphasis supplied).

Because plaintiffs had failed to undertake repairs prior to foreclosure, and recovery under the policy would be limited by the cost of repair, the court of appeals agreed with defendants that plaintiffs had "suffered no loss." The court does not find *McKay* to be on point with the case *sub judice*, where there has been a deficiency judgment and plaintiff would remain liable to that extent.[1] Defendant has offered no evidence that PBE has waived its rights to seek satisfaction for the deficiency from plaintiff. And although defendant argues that the foreclosure extinguished all of plaintiff's interest in the subject property, plaintiff retains an insurable interest even after foreclosure due to continued liability on the note. *See Jet Air, Inc. v. National Union Fire Ins. Co.*, 189 Ga.App. 399, 375 S.E.2d 873 (1988).

---

1. Although the court does not make an express finding on this issue, it would appear that defendant would be entitled to deduct from any ultimate liability the amount paid in at foreclosure.

That ultimate liability would, of course, be the amount it *would have* cost to repair the damaged premises.

The court finds *Jet Air, Inc. v. National Union Fire Ins. Co.*, 189 Ga.App. 399, 375 S.E.2d 873 (1988), also cited by defendants for the proposition that plaintiff suffered no loss, unpersuasive. The insureds had there assigned, as interests appeared, any "loss payable" to its financier. After ending up in a factual posture similar to this case, the court of appeals found the question to be "the extent to which [plaintiffs] are entitled to recover, considering the nature of the loss and the language of the policy and the assignment." *Jet Air, Inc.*, 375 S.E.2d at 876.

By the express language of the policy, the court in *Jet Air* stated that "the only right to recovery was the 'cost to repair.'" To the contrary, the right to recovery *sub judice* is limited to "the extent of the actual cash value of the property at the time of loss, but not exceeding the amount which it *would cost* to repair or replace the property with material of like kind and quality within a reasonable time after such loss...." (emphasis supplied). The language so employed is subjunctive, as opposed to indicative. As such, the cost need not have been determined through actual expenditure; rather, use of the subjunctive mood in the contract of insurance contemplates the "cost of repair" as capable of being simply entertained in thought, contingent, or possible. Under language like that used by the insurer here, no actual expenditure need first be made to preserve liability for payment.

### C. Increased Hazard Due to Plaintiff's Actions

Defendant's alternative basis for summary judgment is that transfer of title to the property to CCC by a deed to secure debt was an act that, either by the policy's own terms or by rule of common law, increased the risk to the insurer and therefore discharged them from liability. This argument is presented in three forms. Its first incarnation springs from *Canal Ins. Co. v. P & J Truck Lines*, in which the court stated the relationship between the delivery of a mortgage on insured property and increased risk thereto:

The making and delivery of a mortgage upon insured property is regarded as a 'moral hazard'. It tends to lessen the interest of the mortgagor in the safety and preservation of the property. When a person insures property which is incumbered or which he afterward incumbers, 'there will sometimes exist a dangerous temptation to withhold protection to such a degree as to invite accident, and this may frequently be done without a conscious intent of wrong-doing on the part of the insured.' The main object seems to be not to permit the insured to do an act without the consent of the insurer which will tend to increase the hazard or risk by lessening the interest of the insured in the preservation of the property.

*P & J Truck Lines, Inc.*, 244 S.E.2d at 84 (quoting *Alston v. Phenix Ins. Co.*, 100 Ga. 287, 27 S.E. 981 (1895)). The court went on to acknowledge that where the reason for the rule failed, so did the rule.

The court does not believe that this rule applies to invalidate the policy of insurance, because there was simply not a material increase in risk. Defendant claims that by reason of the deed transfer, plaintiff lost interest in protecting the subject property— in the event of loss, proceeds therefrom "would not even be used to satisfy Plaintiff's debts." *See* Defendant's Brief, at 9. The court does not find this to be so. Indirectly, plaintiff's debts to Jackson would be satisfied through this arrangement. Additionally, the property was already subject to PBE's primary lien when the insurance agreement was entered into. And plaintiff remained in possession of the premises at all times. There has been no evidence that plaintiff would have profited more from a total loss than from nurturing his ailing enterprise back to economic prosperity.

Most importantly, the policy contains no specific language identifying the type of action taken by plaintiff as one it considered as materially affecting risk. Rather than being specific in its description of events that it would deem to be material increases to risk, defendant chose to create a vague category— increased risk due to "any means within the control or knowledge of the insured"—with the possibility of encompassing more actions. The haziness inherent in such a category must be construed against the insurer, as it

is the one to draft the document. *See James v. Pennsylvania General Ins. Co.,* 167 Ga. App. 427, 306 S.E.2d 422, 425 (1983) (insurance policies are to be construed so as to avoid forfeitures). The court does not find that a transaction which is the functional equivalent of a second mortgage "materially increased" defendant's risk.

Defendant's argument is, secondly, embodied in the rule of law that "an insurance company is discharged from liability under its policy if the risk is materially increased." *James,* 306 S.E.2d at 425. Although the Georgia Supreme Court went on to tie discharge to a proximate cause requirement— release from liability where loss *directly results* as a consequence of such increase in risk—subsequent courts in Georgia have eliminated, or ignored, this hurdle in absolving insurance companies of liability. *Schroeder v. Georgia Farm Bureau Mut. Ins. Co.,* 211 Ga.App. 302, 439 S.E.2d 18, 20 (1993) (no requirement that causal link "between the increased risk ... and the loss itself be shown").

The predicate showing required of defendant for success on this theory is one of "increased risk." As the court concluded above, there has not been a sufficient showing of increased risk here. The property was already the subject of a mortgage when defendant agreed to insure it; plaintiff remained in possession at all times; there was no evidence that plaintiff would profit more from complete destruction of the property than from maintaining the business' viability; and defendant was extremely vague in its description of what it would consider a "materially increased risk."

The final manifestation of defendant's second argument is "a transfer of title to the insured property voids the policy." Defendant first cites *Higdon v. Georgia Farm Bureau Mut. Ins. Co.,* 204 Ga.App. 192, 419 S.E.2d 80 (1992), wherein the Georgia Court of Appeals stated as follows:

The insured may not unilaterally substitute another party to become insured excepting under the provisions of the contract, even if he wished to do so. The insured alone may sue on a policy of insurance. Either transfer of title to property or transfer of

the policy of insurance without the consent of the insurer voids the policy. Insurance policies are of the nature of personal contracts. The insurer is selective of those risks which revolved around the character, integrity and personal characteristics of those whom they will insure.

*Id.,* 419 S.E.2d at 82 (citations omitted). *See also Republic Ins. Co. v. Chapman,* 146 Ga. App. 719, 247 S.E.2d 156 (1978). Defendant claims that this passage entitles it to summary judgment.

As noted previously, plaintiff remained in possession of the premises at all times, and was responsible for it as rental property when he no longer operated his restaurant and lounge there. Indeed, all rental monies were reinvested as repairs and maintenance for his tenants, so that there were no profits during the rental period. (Moore, at 33). Under these facts, the personal characteristics of the person with whom the insurance company was dealing had not changed.

However, defendant also points to a provision in the deed between plaintiff and CCC:

Grantor [Plaintiff] shall assign and deliver to Grantee [CCC], as additional collateral for the payment of the Indebtedness, all policies of insurance which insure against loss or damage to the Premises, and Grantor hereby grants to Grantee a security interest in the proceeds from any and all such policies.

*See* Defendant's Brief, exh. C (page 2, para. 7). Defendant finds this language to be unsurmountable evidence that the policy was transferred to CCC, and was thereby voided. That is not correct. This excerpt from the deed only describes the parties' future intent—that plaintiff "shall" transfer the policy to CCC. There is no evidence that such a transfer was ever made. Indeed, plaintiff's affidavit is explicit on the subject—plaintiff states unequivocally that he has "never assigned any insurance policy to Chrysler Credit Corporation." Plaintiff's Brief, exh. A. *Irby v. Bittick,* 44 F.3d 949, 953 (11th Cir.1995) (courts should resolve all reasonable doubts in favor of non-movant).

It is unrefuted, however, that plaintiff granted a security interest in the property.

Defendant forcefully contends that this effected a change in plaintiff's "interest", from legal titleholder to equitable title holder. The court's initial objection to this characterization is that plaintiff was essentially already an equitable titleholder. PBE was already a mortgagee when this transfer occurred; and PBE remained a mortgagee until it foreclosed in March 1993. Plaintiff was thus always an equitable titleholder. Any change that might have occurred in the nature of that equitable interest is negligible, and not cognizable for purposes of the above-quoted rule.

Additionally, defendant's heavy reliance upon cases such as *Hurley v. Girard Fire & Marine Ins. Co.*, 49 Ga.App. 823, 176 S.E. 785 (1934), *aff'd without opinion*, 181 Ga. 583, 183 S.E. 548 (1936), is misplaced. In *Hurley*, the contract of insurance spelled out with precision the types of transfers and the interests that would not be insured under the policy. No such precision has been employed in the policy *sub judice*. The language used by defendant in drafting the pertinent provision is as follows:

> This entire policy shall be void if, whether before or after a loss, the insured has wilfully concealed or misrepresented any material fact or circumstance concerning the insurance or the subject thereof or the interest of the insured therein....

Defendant's Reply Brief, at 2; Defendant's Brief of 4/20/1993, exh. B. *Hurley*, with its specific list of transfers that qualify for voiding the policy, is incompatible with this vague language, which might be read as covering property-related acts as diverse as granting a three-foot utility easement on the far side of the property to granting a one-year lease of the premises. Each of these obviously changes the "interest of the insured." The question is whether these were "material."

For reasons similar to those stated above, the court finds that any change in interest by the insured here was not material for purposes of the contract of insurance. The property was already the subject of a mortgage when defendant agreed to insure it; plaintiff remained in possession at all times; there was no evidence that plaintiff would profit more from complete destruction of the property than from maintaining the business' viability; and defendant was extremely vague in its description of what transfers it would consider as "materially" altering the insured's interest in the subject property.

### III. CONCLUSION

Defendant agreed to insure plaintiff as a risk. In the absence of an effective cancellation, the policy remains in force. For the foregoing reasons, defendant's summary judgment motion is accordingly **DENIED**.

**SO ORDERED.**