## 77208. PRIVITERA v. ADDISON et al.
(378 SE2d 312)

BIRDSONG, Judge.

The main action in this case was filed for conversion against appellant Anthony M. Privitera by Presidential Financial Corporation (Presidential). Presidential is in the business of financing accounts receivable, generally for small companies with going concerns but with cash flow or other minor financial problems.

Presidential had entered a loan and security agreement with BFA Security & Investigative Agency (BFA) in April 1984. BFA was 90 percent owned and operated by Sara Addison, who had inherited the company from her husband in 1983. She (for BFA) had already borrowed heavily from First Atlanta Bank and had pledged her personal certificates of deposit for this loan when First Atlanta recommended she contact Mr. Goldstein of Presidential. Throughout the trial of this case, Goldstein always indicated he considered Sara Addison to be of highest integrity.

BFA's business depended mainly upon a federal Government Services Administration (GSA) contract to provide armed security guards at IRS facilities in Chamblee, Georgia, and in Kentucky. The GSA payment each month was $156,875.81. However, it lagged behind time for payment of guards' salaries and overhead. There was also the bank loan outstanding of $165,000 and about $100,000 owed in back taxes.

In April 1984, BFA obtained from Presidential an initial lending of $75,000. Presidential took a security interest in all accounts receivable, income, monies and proceeds thereof. Presidential filed a timely UCC financing statement in Fulton County court records.

The Presidential loan involved a revolving line of credit. Seven "draws" were made between April and August 1984. GSA's $156,875.81 payment was directly deposited in BFA's bank and each time, within a day or two, BFA paid Presidential fully by direct deposit. The business prognosis, however, weakened. In July 1984, Sara Addison consulted business brokers to sell the business. She provided a financial statement and gave the brokers access to BFA's files. However, she never met Anthony Privitera until August 6, 1984, when he came to BFA offices for the closing.

Privitera paid Mrs. Addison $10 for her 90 percent share of the corporation. He prepared the closing documents and presented them to Mrs. Addison to sign. Item "C" of this document stated: "There are no corporate loans outstanding other than the [First Atlanta] bank loan payable for $165,000." Item "L" stated: "No loans have been made during the past thirty (30) days other than the revolving line of credit." Item "N," just above the signature, stated: "Accounts receivable are not assigned or encumbered."

Mrs. Addison signed this document. She testified she considered the Presidential arrangements a revolving line of credit and not a loan; and that she was very upset and crying a lot at the closing because of selling the business her husband had built for 10 years, and hardly knew what she was signing. BFA had received "draw" 8, in the amount of $75,000, from Presidential on July 18, 1984. Mrs. Addison did not, until after the August 6 sale, tell Presidential she had sold the business because she said she did not think she was required to do so.

On August 6, 1984, Privitera arrived for business. Sara Addison stayed as a "management consultant" at a salary of $4,000 per month. On August 9, the GSA check for $156,875.81, normally deposited by GSA directly into BFA's bank, First Atlanta, arrived mysteriously at BFA's office. (It was never disclosed at trial how this anomaly occurred.) Mrs. Addison opened the mail, said: "It's here!" and then took it to Privitera's office. She told him firmly the first thing that had to be done was to pay Presidential. Privitera replied that they did not have to pay Presidential for 90 days. When Mrs. Addison said she did not know anything about "ninety days," Privitera responded that he knew the president of Presidential and would take care of the matter.

The testimony of Privitera, who represented himself, was extremely elusive as to whether he knew on August 6 that the accounts receivable were assigned to Presidential. He admitted, however, that he did not examine the courthouse records to determine whether any UCC documents or liens attached to BFA before he purchased the business.

Privitera indicated he found out about Presidential's interests on August 7, 8, 9, or 10. He admitted, however, that Mr. Goldstein, President of Presidential, did call him on August 8, the day before GSA's check arrived; and that Goldstein had found out about the sale, was very irate, and may have said something like, "we're used to getting paid." He had lunch with Goldstein the next week to work out matters; but he elsewhere testified that the first time he found out about Presidential's security interest in accounts receivable was "late in August" or on August 14 or 15, or at the time of his lunch meeting with Goldstein. He hadn't "listened" to Mr. Goldstein on their August 7 or 8 phone call because Goldstein had also called and harassed Mrs. Addison and therefore he (Privitera) did not consider Goldstein reputable.

In the meantime, the new BFA board of directors (Privitera and one other) had voted Privitera an annual salary of $60,000 plus 2 percent of gross revenues. Within days, Mrs. Addison was locked out of BFA's offices and fired from her consulting position. On August 11, Privitera had BFA issue a check to him for $500 for "fee." On August

9 (the date the GSA check arrived), he had BFA issue checks to "Ad Placement" for $300 and $5,000. Ad Placement was a company which placed advertisements on the rear of taxi-cabs; it was owned by Privitera's wife and Privitera was its president. On August 14, Privitera created "BFA Financial, Inc." and directed all BFA Security mail to go to a new "BFA Financial, Inc." Marietta post office box. He also transferred $54,000 of BFA Security deposits to the "BFA Financial" account at First Georgia Bank. On August 17, he wrote a $3,000 check, a $495 check made to "cash" to BFA, and a $5,000 check to "Creative Business Consultants." On August 9, he had committed BFA to pay Creative Business Consultants $7,000 per month. Creative Business Consultants was, effectively, himself, and he admitted the $5,000 was his salary. On August 22, Privitera wrote a BFA check to his law firm for $10,000 to initiate a Chapter 11 bankruptcy.

On August 22, Presidential sent notices of assignment to GSA and all of BFA's commercial accounts. On August 23, Privitera wrote another check to Creative Business Consultants for $10,000 (designated as "fund management" and salary). Also on August 23, Privitera ordered all the security guards pulled off their posts and their guns and equipment removed because of GSA's "default" in not sending him (BFA) an advance of more money after GSA received Presidential's August 22nd notice of assignment. On September 7, 1984, one month after Privitera bought the business, BFA filed proceedings in Chapter 7 for total liquidation.

In its complaint, Presidential also sued Addison, Robert Sandhoff (a BFA officer) and Michelle Roberson (Mrs. Addison's daughter) on personal guarantees. Sandhoff contended he had asked Presidential to be released and had been released, because the conditions set by Presidential had been met. Presidential contended the conditions for release had not been met, because Sandhoff had not requested in writing to be released.

Addison, Sandhoff, and Roberson all cross-claimed against Privitera for indemnity, for his wilful, malicious diverting of BFA's receivables by which they were damaged upon their guarantees (Sandhoff, of course, insisting he had none).

The jury returned a verdict as follows: Robert Sandhoff was released from his guarantee to Presidential. He was awarded $00.00 ("zero dollars") from Privitera, and $10,000 punitive damages from Privitera. Against Privitera, Presidential was awarded $52,548.56 (balance unpaid of "draw" 8); $30,000 attorney fees, and $37,000 punitive damages.

Michelle Roberson was found liable on her guarantee to Presidential, but was awarded indemnification against Privitera in the amount of $52,548.56 (the balance of "draw" 8) and $10,000 punitive damages.

Mrs. Addison was awarded $160,000 for compensatory damages (evidently representing the amount of her certificates of deposit which she earlier pledged to First Atlanta and lost). The jury also awarded her $52,548.56 for indemnification on her guarantee to Presidential for "draw" 8, and $480,000 punitive damages.

Addison, Sandhoff, and Roberson were represented by the same attorney and were awarded $29,530 attorney fees.

Privitera was awarded nothing on his claims against any of the parties. On appeal he enumerates six errors. *Held*:

1. Appellant contends the awards of punitive damages to all parties cannot stand because this case does not involve a tort but is an action on a contract. See cited, *Colonial Pipeline Co. v. Brown*, 258 Ga. 115 (365 SE2d 827) and OCGA § 13-6-10; and see OCGA § 51-12-5.

Clearly the cause of action of each plaintiff and cross-claimant against Privitera was in tort, for conversion of funds assigned to Presidential and for the knowing, wilful and malicious diverting of said funds to the tortious detriment of Addison, Sandhoff, and Roberson. Under appellant's cited case, *Colonial Pipeline Co.*, supra, punitive damages are appropriate for conversion as a tort.

Appellant urges further the punitive damages can be awarded only to plaintiffs, which Addison, Sandhoff and Roberson are not. However, clearly they are plaintiffs in cross-claim for indemnification against Privitera. OCGA § 9-11-13 (g). He also contends the $480,000 punitive damages awarded to Mrs. Addison are excessive "as a matter of law," and this we cannot hold. Exemplary damages lie within the conscience of the jury. The jury obviously found aggravating circumstances in Privitera's acts and intentions sufficiently repugnant to justify this award. They are authorized to so find by OCGA § 51-12-5, in effect at the date of this verdict, January 1987. Absent applicable legislation to the contrary, this appellate court is reluctant to interfere with the jury's sense of conscience in her behalf.

2. Privitera contends the trial court erred in denying him directed verdicts against all co-defendants for their claims of indemnification, because as co-defendants they would be entitled to indemnification only as joint trespassers (tortfeasors).

The fact that joint wrongdoers (see OCGA § 51-12-30 et seq.) might be entitled to indemnification does not mean that other parties might not be so entitled. OCGA § 9-11-13 (g) provides: "[A] cross-claim may include a claim that the party against whom it is asserted is or may be liable to the cross-claimant for all or part of a claim asserted in the action against the cross-claimant."

Quixotically, Privitera contends there cannot be "contribution" where the tortious act involves moral turpitude. Undoubtedly this means one guilty of an act of moral turpitude cannot be entitled to

contribution; but since in this case the act of moral turpitude was by Privitera himself, he cannot complain that another is not entitled to "contribution."

3. In his third enumeration, Privitera claims Presidential could not recover for conversion because it is not seeking to recover some specific money, but money generally (see *Hodgskin v. Markatron Inc.*, 185 Ga. App. 750 (365 SE2d 494)); and that Presidential must show not merely equitable title in the allegedly converted matter, but legal title.

This enumeration is without merit. An exercise of dominion or control over property, which is inconsistent with the legal rights of a secured party, is a conversion of the property. A secured interest in accounts receivable is a legal interest. *Trust Co. v. Assoc. Grocers Co-Op.*, 152 Ga. App. 701, 702 (2) (263 SE2d 676).

4. In enumeration 4, Privitera contends the trial court erred in failing to direct a verdict to him on the issue of attorney fees, because only *plaintiffs* can recover attorney fees (cited, OCGA § 13-6-11), and Addison, Sandhoff and Roberson were not plaintiffs. In Division 1 of this opinion, we disposed of the contention that cross-claimants are not positioned as plaintiffs against Privitera.

The conversion count supports the attorney fees awards. The actions of plaintiff Presidential and cross-claimants Sara Addison, Sandhoff, and Roberson were founded upon the fraud and deceit of Privitera. *F. N. Roberts Pest Control Co. v. McDonald*, 132 Ga. App. 257 (208 SE2d 13). The evidence supports a finding of bad faith in the dealings of Privitera with BFA, Presidential, Addison, Sandhoff, and Roberson. The plaintiff and cross-claimants "specifically pleaded and . . . made a prayer" for attorney fees (OCGA § 13-6-11) and are entitled thereto.

5. The trial court did not err in failing to direct a verdict in Privitera's favor on grounds that Presidential had assigned its interests in BFA's accounts receivable to another corporation, ITT, and thus was not the proper party to bring suit.

For all this record shows, Presidential was the damaged party; Privitera has not proved otherwise, nor is he the proper party to complain on behalf of ITT. Cf., OCGA § 9-11-25 (c). Further, a plaintiff in a conversion action need not show he is absolute owner of the converted property; he only need show a right of action or possession in the property. See *Gilbert v. Rafael*, 181 Ga. App. 460 (352 SE2d 641).

6. Privitera contends the trial court erred in submitting to the jury a claim for Sara Addison's lost certificates of deposit.

Addison did not specifically plead and pray in her complaint for compensation for these forfeited funds, but the issue was litigated without objection from Privitera. Therefore, the pleadings must be treated as if amended to include a plea and prayer for such compen-

sation, since the issue was tried by express or implied consent of the parties. OCGA § 9-11-15 (b). The evidence showed Addison lost her certificates after the intervention of Privitera into BFA's affairs, and the jury could conclude he was the cause of that loss.

7. Although the point is not specifically raised by Privitera, the judgments in favor of Presidential, Sara Addison and Michelle Roberson, each in the amount of $52,548.56 (representing the amount finally owed to Presidential by BFA), appear to be duplicative. The jury released Sandhoff from his guarantee, finding he had met Presidential's stated conditions for release. The jury also carefully found each other guarantor liable for the full debt to Presidential on their individual guarantees. This amounts to $157,645.68 for BFA's final debt to Presidential of $52,548.56.

The trial court should review the evidence to determine if these multiple verdicts for one debt are excessive; and if they are, they should be stricken except to the extent necessary to satisfy the $52,548.56 debt owed to Presidential.

8. Though Roberson's award of indemnification on her guarantee be stricken, and though Sandhoff was released from his guarantee and awarded "zero dollars" in indemnification, the "specially pleaded" and prayed-for award of attorney fees in the case of both Roberson and Sandhoff constitute actual damages under the express terms of OCGA § 13-6-11. In point of fact, they are actual damages. Therefore, these awards of attorney fees support the awards of punitive damages to Roberson and Sandhoff.

The verdict and judgment below are affirmed, except to the extent it must be remolded consistent with Division 7 to prevent duplication of recovery by Presidential of the final balance owed: $52,548.56.

*Judgment affirmed on condition any excessive or duplicative verdict be stricken; otherwise reversed in part. Banke, P. J., and Beasley, J., concur.*

DECIDED JANUARY 3, 1989 —
REHEARING DENIED JANUARY 31, 1989 — 

*Gershon, Olim, Katz & Loeb, William R. Lester, Fred J. Stokes,* for appellant.

*Louis K. Polonsky, Kirk McAlpin, Jr., Susan S. Jones,* for appellees.