A95A1188. WILLIAM GOLDBERG & COMPANY, INC. et al.
v. COHEN et al.
A95A1189. COHEN v. WILLIAM GOLDBERG & COMPANY,
INC. et al.
A95A1190. COHEN et al. v. WILLIAM GOLDBERG &
COMPANY, INC. et al.
(466 SE2d 872)

SMITH, Judge.

These appeals arise out of extensive litigation concerning a 1986 business transaction. Structured as a stock exchange, that transaction represented an attempt to combine three business entities: William Goldberg & Company, Inc. ("WGC"), the personal services corporation of business broker and financial and management consultant William S. Goldberg; the T-Shirtery, Inc., a screen printing and embroidery business owned by Jay Cohen ("Jay"); and All-Star Imprinting, Inc., owned by Steve Radford through his holding company, the Hightower Corporation. Jay Cohen's father, J. Joseph Cohen ("Joe"), occasionally provided both advice and loans to Jay, and at the time the transaction in issue was pending, Joe held a security interest in inventory, equipment, receivables and other personal property of the T-Shirtery. It is undisputed that this security interest was perfected by filing a U.C.C. financing statement.

The transaction fell through, and litigation commenced. Jay filed suit seeking a declaration that no enforceable contract existed, and Goldberg, WGC, Radford, Hightower, and All-Star filed numerous counterclaims. Joe was permitted to intervene; upon his subsequent death his estate (represented by his son Brent and his widow Betty,

who were co-executors) was substituted as a party to the litigation. The trial court dismissed many of the claims made by Jay and the estate and realigned the parties, making WGC a plaintiff and Jay and the estate defendants.

In *Cohen v. Wm. Goldberg & Co.*, 202 Ga. App. 172 (413 SE2d 759) (1991) (*"Cohen I"*), this Court consolidated four appeals brought by Jay and the estate and addressed a number of issues. We held in *Cohen I* that the trial court properly denied Jay's motion for summary judgment on the issue of whether an enforceable contract existed, concluding that a question of fact remained regarding the circumstances surrounding the execution of the deferred compensation agreement. A jury must decide whether certain unfulfilled conditions terminated the contract by its own terms or constituted a breach of the contract. Id. at 176-177 (1) (f).[1]

We also decided in *Cohen I* that Joe was not a party to the contract,[2] id. at 177 (2), but an intended beneficiary, and thus he could not be held liable for tortious interference with the contract, id. at 177-178 (3). We also held that certain claims based upon violations of federal and state securities laws were inappropriate because those laws were inapplicable to this transaction. Id. at 179-180 (5). Finally, we reinstated the remainder of Joe's and Jay's claims, id. at 180-184 (6), but declined to hold that the trial court abused its discretion in realigning the parties. Id. at 184-185 (7). The Supreme Court granted certiorari as to the holding of this Court regarding the applicability of the securities laws. Following reversal of our holding that the securities laws were inapplicable, *Cohen v. William Goldberg & Co.*, 262 Ga. 606 (423 SE2d 231) (1992) (*"Cohen II"*), the case returned to the trial court.

Upon remittitur, a different judge entered orders on several motions, including renewed cross-motions for summary judgment or to dismiss claims and renewed motions on realignment. The three present appeals are taken by WGC, Goldberg, Radford, Hightower, and All-Star (collectively "WGC"), Jay, and Joe's estate from the various rulings by the trial court after remittitur; we have consolidated the three appeals for review in this opinion.

Case No. A95A1188 is WGC's appeal from those portions of the trial court's various orders eliminating all its claims against Joe's estate and Jay except for the claim against Jay for breach of contract. WGC also appeals from the trial court's failure to dismiss Jay's claim

---

[1] That issue still remains for decision.

[2] Although in the prior appeal, as in this one, Joe's interests were represented by his estate, it was noted in *Cohen I* that for the sake of clarity Joe would be referred to as a party to the appeal.

against it for attorney fees.[3] In Case No. A95A1189, Jay appeals from those portions of the trial court's orders granting summary judgment against him on all his claims against WGC except his claim for attorney fees, from the trial court's refusal of his request to consider certain language in the deferred compensation agreement, and from the trial court's denial of his motion to realign the parties. In Case No. A95A1190, Joe's estate appeals from those portions of the trial court's orders granting summary judgment to WGC on the estate's claim of conversion of its collateral, and from the denial of the estate's motion to realign the parties.

For the reasons that follow, we affirm the trial court's rulings challenged in Case No. A95A1188.

1. WGC contends the trial court erred in eliminating its claims against Jay and the estate based upon fraud. The fraud claims fall into three general categories: (a) alleged misrepresentations in the stock exchange agreement executed by Jay (but not by Joe); (b) Jay's alleged present intention not to perform the transaction despite execution of many of the necessary documents (and an alleged conspiracy between Jay and Joe in this regard); and (c) alleged securities fraud.

(a) WGC argues that the documents signed by Jay contained express misrepresentations because they failed to disclose the existence of Joe's security agreement or the possibility that it could interfere with the pending transaction.

It is undisputed, however, that WGC and its attorneys had both actual and constructive knowledge of Joe's security agreement before the documents were signed. The very purpose of U.C.C. financing statements is to provide notice to interested third parties that enforceable security interests may exist in property. See *Kubota Tractor Corp. v. C & S Nat. Bank*, 198 Ga. App. 830, 834 (403 SE2d 218) (1991). In addition, Goldberg was present during the closing of a loan to the T-Shirtery from Shawmut Credit Corp. — a loan he, in fact, had helped the T-Shirtery procure — during which the existence of Joe's security interest was specifically and expressly disclosed, in relation to an inter-creditor agreement. In preparing for execution of the documents necessary to complete the proposed transaction, WGC's attorneys also performed a routine U.C.C. search, which revealed the existence of the U.C.C. financing statement.[4] "It is well settled that

---

[3] We note that all WGC's claims against Joe's son Brent, individually, and its claim against Jay, Joe, and Brent sounding in conversion were also dismissed by the trial court, but the dismissal of these claims is not appealed.

[4] WGC had maintained previously that until informed by Joe's lawyer in early June 1986, it had no knowledge of Joe's security interest. In 1993, however, WGC acknowledged that Goldberg "had knowledge" of a security interest claimed by Joe.

notice to an attorney is notice to the client employing him, and that knowledge of an attorney is knowledge of his client, when such notice and knowledge come to the attorney in and about the subject matter of his employment." (Citations and punctuation omitted.) *Oseni v. Hambrick*, 207 Ga. App. 166, 167 (427 SE2d 559) (1993). Moreover, it appears that Goldberg's attorney sent him a copy of the financing statement. Given this evidence, it cannot seriously be argued that WGC was without knowledge of Joe's security interest or the terms of his security agreement with the T-Shirtery.

*Rivers v. BMW of North America*, 214 Ga. App. 880 (449 SE2d 337) (1994), is cited by WGC in support of its argument that actionable fraud was present here based on Jay's reckless failure to disclose the truth. *Rivers*, however, involved concealment by one party to a sales contract of facts that the other party to the contract could not have discovered by the exercise of ordinary prudence. Id. at 883-884 (2). Therefore, it cannot apply to the facts in this case. For several reasons, we likewise do not agree with WGC's argument that its position is identical to that of the defrauded party in *Tower Fin. Svcs. v. Jarrett*, 199 Ga. App. 248 (404 SE2d 622) (1991). First, this argument clearly does not apply to Joe. An obligation to disclose must exist before a party may be held liable for fraud based upon the concealment of material facts. Id. at 250. Even assuming that Joe's security interest was concealed, no evidence demonstrates any obligation on *Joe's* part to disclose it. Second, even as to Jay, assuming he did have such an obligation, unlike the defrauded party in *Jarrett*, Goldberg is a sophisticated businessman from whom greater diligence is required before reliance upon representations may be considered justified.

In light of the evidence in this case, the trial court concluded that if in fact misrepresentations existed in the stock exchange agreement and WGC relied upon any such representations that no security agreement existed, such reliance was simply "blind" reliance because WGC knew, or at the very least should have known, the representations were untrue. The trial court ruled, therefore, that WGC could not claim fraud because its reliance was not justified. We find the trial court's reasoning to be correct.

Even were this reasoning erroneous, the trial court's conclusion would not be undermined, since we also find that the representations in the stock exchange agreement executed by Jay were not fraudulent in this regard. That agreement contains a representation in § 2.9 that "[e]xcept as disclosed in Exhibit C . . . , neither the T-Shirtery nor All-Star is a party to . . . or bound by, any written or oral . . . contracts or commitments involving any loan, guarantee, letters of credit or financing arrangement [that would be placed in default by or would interfere with or invalidate the proposed transaction]." Exhibit C accurately lists both the Shawmut loan and Joe's letter of credit as

exceptions. In addition, § 2.11 of that agreement provides that "[e]xcept as disclosed on Exhibit E, . . . each of the T-Shirtery and All-Star has good and marketable title to all of its owned properties and assets . . . subject to no mortgage, pledge, lien . . . encumbrance or charge. . . ." Exhibit E, in turn, refers back to Exhibit C, stating that except for those loans referenced in Exhibit C, the T-Shirtery owns all other properties reflected on financial statements free of liens or encumbrances.

The trial court did not err in granting summary judgment to Jay and the estate on WGC's claims of fraud consisting of express misrepresentations in the stock exchange agreement.

(b) WGC argues that Jay had a present intent not to perform his obligations as required under the documents comprising the transaction, even before executing those documents. We do not agree.

This Court held in *Cohen I* that a jury issue exists on the *breach of contract claim* because Jay's testimony and that of Goldberg was in conflict regarding the specifics of the execution of the deferred compensation agreement, including the time and manner in which the handwritten interlineations were made. 202 Ga. App. at 174-175. We did not hold, however, or even suggest, that Jay *intended* not to perform under these documents before executing them. We now conclude that the evidence (including the voluminous record in *Cohen I*) does not show such an intent on Jay's part or a "conspiracy" or plan between Joe and Jay not to perform. No evidence exists to support the allegation that Jay deceived his own attorney. Those portions of the evidence pointed to by WGC as supporting this contention, including statements made by Brent, are either misconstrued, mischaracterized, or misrepresented.

Jay's deposition testimony, as outlined in *Cohen I*, was that his main concern was payment for his stock in the T-Shirtery; he stood ready to complete the transaction if an agreement could be reached regarding this payment. He desired payment in the form of a note secured by stock in WGC. Goldberg, on the other hand, proposed payment in the form of deferred compensation based upon future profits of the combined entities. The proposed transaction fell apart precisely on this issue: Goldberg insisted on his absolute right to fire Jay, with a concomitant forfeiture by Jay of all unpaid deferred compensation (which was also payment for Jay's stock in the T-Shirtery) if such an event occurred. Although Jay agreed to accept deferred compensation, he refused to agree to grant to Goldberg the right to fire him at will *and* deprive him of payment for his stock by withholding deferred compensation. See *Cohen I*, 202 Ga. App. at 173-175 (1) (a), (b).

In addition to being aware of Joe's security interest, WGC knew from the beginning that Joe opposed the "deal." Joe's opposition to

the transaction is not evidence that Jay intended not to perform. In fact, Jay persisted in going forward with this transaction *despite* his family's attempts to dissuade him.

Relying upon *McFarland v. Kim*, 156 Ga. App. 781 (275 SE2d 364) (1980), WGC insists that Jay's present intent not to perform is shown by his failure to deliver documents he promised to deliver under the escrow and modification agreement. This failure cannot be used, however, to establish present intent not to perform at the time of making the agreement. The evidence as to this issue has not changed, and the law of this case, as established in *Cohen I*, is that "a question of fact exists whether the parties abandoned their performance of the escrow agreement in direct response to Cohen's alleged breach of the sale contract, see OCGA § 13-4-23, or whether the failure to satisfy the escrow agreement was so unrelated to the dispute over the [deferred compensation agreement] as to constitute an independent basis for holding that the sale contract terminated, per the escrow agreement provision, because the escrow was never completed." Id. at 177 (1) (f).

Moreover, this contention by WGC directly contradicts a position it previously took on the same evidence. In its response to Jay's first motion for summary judgment, WGC admitted by implication that Jay did not harbor a present intent not to perform; WGC alleged, rather, that Jay had "second thoughts" *after* executing the documents. Since a pleader is bound by the allegations in his own pleadings, *State Hwy. Dept. v. Lumpkin*, 222 Ga. 727 (152 SE2d 557) (1966), WGC may not now claim the contrary is true. The trial court correctly granted summary judgment to Jay and the estate on WGC's fraud claim based upon Jay's present intent not to perform.

(c) WGC maintains the trial court erred in granting summary judgment to Jay and the estate on WGC's claims for securities fraud. It is unclear how the claim of securities fraud differs from the allegations of express misrepresentation in the stock exchange agreement and the alleged violation of the securities laws. To the extent that it involves the same claims of misrepresentation addressed in Division 1 (a), supra, we agree with the trial court that it required the same showing of justifiable reliance. Consequently, our holding in Division 1 (a) controls this contention as well. To the extent that it involves the violation of securities laws, we address it in Division 2, infra.

We note that WGC's position that the trial court did not address all its claims based upon fraud is not well taken. A trial court need not address specifically all possible allegations. Nevertheless, the court summarized the fraud allegations and recited that it was granting summary judgment as to Counts III and IV of WGC's complaint, as amended. This is an unambiguous statement that no fraud claims remain pending. The trial court properly granted summary judgment

to Jay and the estate as to all WGC's allegations of fraud and conspiracy to defraud.

2. As to WGC's claims involving the violation of securities laws, the Supreme Court in its opinion reinstated "all claims arising from the alleged violations" of the securities laws. 262 Ga. at 611 (3). We agree with Jay, however, that despite this apparently inclusive language, the Supreme Court reinstated only those securities law claims raised by Jay. The Supreme Court granted certiorari to review that portion of this Court's opinion dealing with the securities law claims; our opinion in *Cohen I* dealt only with the securities law claims raised by Jay. Although the trial court had granted cross-motions for summary judgment on all the securities law claims, WGC did not appeal the grant of summary judgment to Jay on its securities law claims; neither did it file a cross-appeal when Jay appealed to this Court. The elimination of WGC's securities law claims was thus unappealed. It is subject to the law of the case rule and consequently was the settled law of this case when *Cohen I* was decided. We need not now address, therefore, the substance of WGC's contentions regarding these claims.

3. WGC asserts error in the trial court's elimination of its claims against Jay and the estate based upon interference with contractual relations. It is beyond cavil that all such claims relating to Joe's interference with the transaction in issue were decided against WGC in *Cohen I* and may not be raised here. After remittitur, however, WGC added claims that Joe *and Jay* tortiously interfered with *All-Star*'s business relationships — claims the trial court refused to allow Radford to add several years earlier — and that they conspired to breach the stock exchange agreement.

WGC contends these claims are based *not* upon tortious interference with the *stock exchange agreement*, as were the claims in *Cohen I*, but at least in part upon other conduct of Joe and Jay (and later Brent). WGC alleges that Joe and Jay prevented All-Star from producing products during the time period after the execution of the stock swap documents when it was operating on the premises of the T-Shirtery, and that this resulted in All-Star's demise. WGC also contends its claims are partly for tortious interference with All-Star's "prospective business advantage" by Jay and Joe. The trial court concluded that these claims were barred by the holdings in *Cohen I*. We agree with the trial court's conclusion. The addition of Jay as a target of the allegations of tortious interference and of Joe as a conspirator to breach the contract does not serve to change the nature of either cause of action. The gist of the action is not any alleged conspiracy; it lies within the nature of the tort alleged. As it did prior to *Cohen I*, WGC alleges in these amended claims the tort of interference with contractual relations. The fact that the tort is now alleged against additional parties, that interference with All-Star's future business rela-

tions or "prospective business advantage" is now claimed by WGC, or that a conspiracy is part of the claim is of no consequence. No new facts are alleged; the evidentiary posture of the case is no different in this regard now than it was when we held in *Cohen I* that WGC's tortious interference claim was extinguished in its entirety.

A claim of tortious interference is now precluded by the law of the case. If other facts could have been summoned by WGC to support its claim for tortious interference, WGC was required to state them then. Instead, it stood on its pleaded allegations. After remittitur, relying on exactly the same facts, WGC recast its complaint to assert new "theories" of recovery on essentially the same claim of tortious interference. These theories were "ascertainable" under the original complaint, however, and accordingly did not survive the holding in *Cohen I. Summer-Minter & Assoc. v. Giordano*, 231 Ga. 601, 605 (203 SE2d 173) (1974). The trial court properly granted summary judgment against WGC on these claims.

4. The trial court left standing Jay's claim against WGC for attorney fees pursuant to OCGA § 13-6-11. WGC asserts this was error, because the trial court left no other claims of Jay pending. The trial court's order states no reason for denying WGC's motion for summary judgment as to this claim. It is true, as WGC argues, that expenses of litigation are not recoverable pursuant to OCGA § 13-6-11 unless some other damages are recoverable as well. *Connell v. Houser*, 189 Ga. App. 158, 160 (5) (375 SE2d 136) (1988). Because our decision in Division 6 (b), infra, reinstates at least one of Jay's claims, however, summary judgment was properly denied to WGC on Jay's claim for attorney fees under OCGA § 13-6-11.

5. Case No. A95A1189 is Jay's appeal from other rulings made by the trial court. We affirm those rulings in part and reverse in part.

In *Cohen I*, this Court held that the trial court properly denied Jay's motion for summary judgment on the issue of whether an enforceable contract existed. Jay now contends the trial court erred in failing to consider a legal argument, raised for the first time after remittitur, supporting his contention that the parties failed to reach a meeting of the minds and no enforceable contract exists. His argument focuses on the opening words of the deferred compensation agreement: "Jay Cohen ('Employee') and William Goldberg & Co., Inc. ('Employer') *agree to enter into* a deferred compensation agreement providing as follows: . . . ." (Emphasis supplied.) Jay maintains these words constitute an unenforceable "agreement to agree."

We will not address the merits of this argument. The trial court properly refused to consider it, although not for the reason given in its order. The argument may not be considered because it is precluded by the law of the case.

Nothing in OCGA § 9-11-56 limits the right of a party to move

again for summary judgment after denial of such a motion. When the denial is affirmed on appeal, however, it establishes as the law of the case that the movant is not entitled, on the basis of the record as it then existed, to summary judgment. *Premium Distrib. Co. v. Nat. Distrib. Co.*, 157 Ga. App. 666, 667-668 (1) (278 SE2d 468) (1981). See OCGA § 9-11-60 (h); compare *T. L. Rogers Oil Co. v. S. Carolina Nat. Bank*, 203 Ga. App. 605, 606 (2) (417 SE2d 336) (1992) (renewed motion not barred because denial of original motion not appealed). It is well established that when a ruling is appealed, the appealing party must raise all available grounds. *Lankford v. Milhollin*, 201 Ga. 594, 603 (3) (40 SE2d 376) (1946). The deferred compensation agreement language in issue was part of the record in *Cohen I*, and it is now raised in support of a contention made both in the trial court and on appeal in *Cohen I*: that no enforceable contract was created. Consequently, the trial court was not authorized to consider it. We therefore affirm the trial court's refusal to consider this argument under the principle that a trial court's ruling right for any reason will be affirmed. *Orkin Exterminating Co. v. McIntosh*, 215 Ga. App. 587, 590 (452 SE2d 159) (1994).

6. Jay also maintains the trial court erred in granting WGC's motion for summary judgment on his remaining claims of common law fraud, securities fraud under both federal and state law, and breach of fiduciary duty.[5]

Jay's claims under the securities acts are based upon the same misrepresentations that form the basis for his claim of fraud. Therefore, as noted by the trial court, they require the same elements and will be addressed together. These claims are based upon two categories of alleged misrepresentation by Goldberg.

(a) Jay first claims Goldberg misrepresented All-Star's financial condition to him in an effort to induce him to enter into the transaction in issue. Jay alleges he had a confidential relationship with Goldberg, trusted him completely, and because of that trust, relied upon representations made by Goldberg regarding All-Star's financial condition. He argues that under these circumstances, Goldberg's misrepresentations constituted both common law and securities fraud and breached Goldberg's fiduciary duty to him personally. We agree with the trial court that these claims fail because Jay's alleged reliance on the misrepresentations was not justified.

Goldberg played several roles and wore a number of hats in his relationship with Jay and the T-Shirtery. A confidential relationship may have existed between the T-Shirtery and Goldberg prior to this

---

[5] The trial court also granted summary judgment against Jay on his claim of intentional infliction of emotional distress, but this ruling is not enumerated as error or addressed in Jay's brief on appeal. We conclude, therefore, that Jay has abandoned this claim.

transaction, when Goldberg was working within his role as financial consultant to the T-Shirtery. Even assuming without deciding, however, that a confidential relationship existed with Jay personally at some point, no such relationship existed at the time the alleged misrepresentations were made. Contrary to Jay's assertion that he did not terminate his confidential relationship with Goldberg until after the documents were signed, the record establishes that when negotiations began with respect to this transaction, any such relationship was abandoned. During the negotiations, Goldberg was not acting within his role in a confidential relationship; he was interested in the outcome of the proposed transaction not merely as an advisor or consultant to All-Star and the T-Shirtery, but either personally or to derive benefit for his own corporation, WGC. This is evidenced by the fact that each party was represented during the negotiations by separate and independent counsel.

The buyer and seller of property are not, by virtue of their status as such, placed in a confidential relationship to each other but are presumed to be dealing at arm's length. *Gardiner v. McDaniel*, 202 Ga. App. 663, 664 (1) (415 SE2d 303) (1992). Moreover, when negotiations intensified, Goldberg *"insisted* on maintaining an arm's length relationship with [Jay]." (Emphasis supplied.) *Cohen I*, supra at 174 (1) (a). Because *this transaction* was at arm's length, no confidential relationship existed. The fact that Jay had confidence in Goldberg's business acumen and trusted him does not mandate a finding that a confidential relationship existed. "In the majority of business dealings, opposite parties have trust and confidence in each other's integrity, but there is created no confidential relationship by this alone. [Cits.]" *Big Bend Agri-Services v. Bank of Meigs*, 174 Ga. App. 493, 495 (1) (330 SE2d 422) (1985). The trial court did not err in granting summary judgment to WGC on Jay's claim for breach of fiduciary duty.

The contract documents contain no warranties relating to All-Star's financial condition. Because no confidential relationship existed, Jay had an obligation to verify any representations concerning All-Star. He and his counsel had access to, and could have examined, All-Star's books and records. Because they failed to do so, any reliance on Goldberg's representations concerning All-Star's financial condition was indeed "blind" and unjustified. See *Consulting Constr. Corp. v. Edwards*, 207 Ga. App. 296, 298 (1) (427 SE2d 789) (1993); *Southern Intermodal Logistics v. Smith & Kelly Co.*, 190 Ga. App. 584, 586 (1) (379 SE2d 612) (1989). Justified reliance is an essential element of any fraud claim, and the absence of this element supports the trial court's grant of summary judgment to WGC on all Jay's claims of common law and securities fraud based upon these misrepresentations. See *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474)

(1991).

(b) Jay also maintains Goldberg made false representations to Shawmut (the T-Shirtery's lender) about the T-Shirtery's financial condition that induced Shawmut to make additional monetary advances to the T-Shirtery. He claims these misrepresentations contributed heavily to the T-Shirtery's eventual insolvency and damaged him personally because when the T-Shirtery could not repay these advances, Shawmut drew on the letter of credit from Joe, which Jay had backed with a personal guaranty. The trial court ruled that this claim arose from an injury to the T-Shirtery, and it was therefore derivative in nature and could not be asserted in a direct action by Jay. We do not agree with this ruling.[6]

In *Phoenix Airline Svcs. v. Metro Airlines*, 260 Ga. 584 (397 SE2d 699) (1990), this Court adopted the principle (codified under Delaware corporations law but embodying established common law) that in order to have standing to sue individually rather than derivatively on behalf of a corporation, a shareholder must allege a "special injury," i.e., an injury different from and more than the wrong to the corporation. Id. at 585-586; see *Elster v. American Airlines*, 100 A2d 219, 221-223 (Del. Ch. 1953); *Kramer v. Western Pacific Indus.*, 546 A2d 348, 351 (II) (Del. 1988). If the injury suffered by the shareholder is common to all shareholders, it is not a "special injury" and may be redressed only in a derivative action on behalf of the corporation.[7] To gain the right to *sue* directly, the shareholder must be *injured* directly — independently of the corporation's injury. Id.

Claims of mismanagement or waste of corporate assets and the concomitant devaluation of the shareholder's stock have generally been found to be derivative. In contrast, in this case, although certain aspects of Jay's claim appear to be based upon mismanagement, the basis for Jay's particular injury is Jay's status as a guarantor of the corporate debt. We have found no law specifically addressing whether a shareholder's liability under a personal guaranty of corporate debt is a "special injury." Both common sense and established Georgia law, however, persuade us that it is.

A guaranty is a contract separate and distinct from the obligation it guarantees. See *Graybar Elec. Co. v. Opp*, 138 Ga. App. 456, 458 (2) (226 SE2d 271) (1976). Harm to the corporation from the tortfeasor's act or omission therefore does not necessarily limit a guarantor of cor-

---

[6] We note that the 1988 revision of the Georgia Corporation Code permits a shareholder in a "statutory close corporation" to bring a direct action for relief, including damages, for certain wrongs to the corporation. OCGA § 14-2-940 (a) (1). The injury here, however, predated the revision of the Code.

[7] Certain contractual rights of shareholders may also be addressed directly rather than derivatively, but these are not at issue here. See *Holland v. Holland Heating &c.*, 208 Ga. App. 794, 797-798 (3) (432 SE2d 238) (1993).

porate debt to a derivative action on behalf of the corporation when the tortfeasor's action also causes injury to him individually under his contract of guaranty. See *Lipton v. News Intl.*, 514 A2d 1075, 1079 (Del. 1986).

Moreover, a personal guarantor of corporate debt need not be a shareholder. Although Jay was, in fact, the sole stockholder in the T-Shirtery, the personal guaranty was not executed in his capacity as a shareholder, and owning stock is certainly not a prerequisite to giving such a guaranty. Jay would not have been liable personally for the T-Shirtery's debt but for the execution in his individual capacity of an independent contract agreeing to assume that liability if certain contingencies occurred. His liability on the guaranty contract is therefore independent of his status as a shareholder, and the injury did not occur to him as a shareholder. Given the independent nature of the guaranty contract, both in law and logic, and the clear distinction between Jay's injury as guarantor and the injury to the corporation and its shareholders, we hold that Jay's liability on this contract was a "special injury" entitling him to bring a direct action. The trial court erred in ruling otherwise.

7. In Case No. A95A1190, the appeal by Joe's estate from two rulings of the trial court, we conclude that these rulings were erroneous, and we therefore reverse.

The estate first contends the trial court erred in granting summary judgment in favor of WGC on the estate's claim for conversion of its collateral. We agree with this contention. We note for the sake of clarity that we do not here hold that WGC converted T-Shirtery property in which Joe had an interest; a jury question remains as to that issue because the evidence is in conflict regarding whether WGC's actions relating to the collateral were proper. We hold only that the trial court erroneously concluded that WGC was entitled to judgment as a matter of law against Joe's estate on its claim for conversion of collateral. The estate asserts that Goldberg and WGC converted T-Shirtery inventory that served as collateral under a security agreement for Joe's letter of credit and other debt of the T-Shirtery to Joe.[8]

The record reveals that in December 1987, an involuntary Chapter 11 bankruptcy petition was filed against the T-Shirtery which, in October 1989, was converted to a Chapter 7 bankruptcy. The assets of the T-Shirtery were liquidated and the Shawmut loan was fully paid, in part by Shawmut calling Joe's letter of credit and in part from the

---

[8] The estate also claimed that WGC fraudulently conveyed T-Shirtery funds while the T-Shirtery was insolvent; this claim has been dropped on appeal. The estate concedes that unlike its claim for conversion, which asserts an interest in specific property, its claim based upon fraudulent conveyance passed to the trustee in bankruptcy under bankruptcy law.

liquidation of T-Shirtery inventory, which was also collateral for Joe's letter of credit. By August 1989, the T-Shirtery's secured debt to Joe reached $320,000, including amounts owed for payment of Joe's letter of credit ($150,000), a fee for obtaining that letter of credit ($5,000), and an additional secured $25,000 note from the T-Shirtery to Joe. The debt also included more than $110,000 in attorney fees and expenses incurred in collecting this debt,[9] and approximately $30,000 in accrued interest. This debt to Joe's estate was secured by T-Shirtery inventory, receivables, and other personal property.

Joe's claim against the T-Shirtery was settled by agreement in the bankruptcy case. The settlement agreement recites that the claims of Joe's estate against the trustee were settled in return for payment of $143,000 plus certain interest amounts and funds in the "Jay Cohen note account" for a total payment admitted by the estate in its brief on appeal to be $245,000. The agreement also provides that although the parties to the agreement release the trustee in bankruptcy and the T-Shirtery from any claims, the Joe Cohen estate "does not hereby release Jay Cohen . . . or anyone who may for any reason be liable to the Joe Cohen estate for any or all of the Joe Cohen estate's claims against the T-Shirtery."

The estate argues that the trial court erred in two respects: first, in failing to apply the proper formula for determining the measure of damages to its interest in the converted property as a secured creditor; and second, in overlooking evidence of actual damage to the estate under the correct formula.

(a) Contrary to WGC's argument, a secured creditor need not have foreclosed its interest to maintain an action for conversion of its collateral. A secured creditor has a right of action for conversion if property subject to its security interest is disposed of without the creditor's authorization. The elements of such a claim include the showing of a valid security interest in the debtor's property, disposition of that property, absence of the creditor's authorization for the disposition, and resulting damage to the creditor. See generally *Trust Co. &c. v. Associated Grocers Co-op*, 152 Ga. App. 701, 702 (2) (263 SE2d 676) (1979); accord *Privitera v. Addison*, 190 Ga. App. 102, 106 (3) (378 SE2d 312) (1989). The record clearly includes some evidence of the first three of these elements, although the conversion is disputed. The primary issues for decision here are whether the estate has remaining damage after the bankruptcy settlement, and if so, whether such damage is recoverable.

It has long been the law in Georgia that the measure of damages

---

[9] Contrary to WGC's assertion, the security agreement does specify that attorney fees equal to 15 percent of principal and interest owed are recoverable.

for conversion of an ownership interest in property is the highest value of the property existing between its conversion and the time of trial. OCGA § 44-12-152. The measure of damages for conversion of an interest in property less than complete ownership is limited to the value of that interest. *Jeweler's Fin. Svcs. v. Chapes, Ltd.*, 181 Ga. App. 872, 873-874 (4) (354 SE2d 200) (1987); *Zugar v. Glen Falls Indem. Co.*, 63 Ga. App. 660, 662 (11 SE2d 839) (1940). Where the interest is a security interest, the measure of damages is the *lower* of the value of the converted property or the outstanding amount of the debt. *Hodges v. Cummings*, 115 Ga. 1000, 1001 (42 SE 394) (1902); *Jeweler's Fin. Svcs.*, supra at 873 (3) (measure of damages for conversion of purchase money security interest in ring is not value of ring but balance due on purchase price). Finally, the outstanding balance of the debt must be measured as of the date of trial. *Holmes v. Langston & Woodson*, 110 Ga. 861, 867 (2) (36 SE 251) (1900); accord *Rose City Foods v. Bank of Thomas County*, 207 Ga. 477, 481-482 (2) (62 SE2d 145) (1950). After all, if all or a portion of the debt has been paid after conversion, the secured creditor would not be entitled to recover the portion that has been paid; the outstanding balance of the debt "provide[s] the ceiling for any monetary recovery the [secured creditor] could receive. [Cit.]" *Hudson Properties v. C & S Nat. Bank*, 168 Ga. App. 331, 334 (4) (308 SE2d 708) (1983). The trial court erred in ruling that the damages recoverable on this claim would be "the value of [Joe's] security interest at the time of the property's alleged conversion."

(b) The record shows Goldberg used T-Shirtery property, including inventory and receivables worth over $168,000, for the benefit of others, whether properly or not. It is undisputed that this property was also collateral for the debt to Joe. The estate demonstrated that T-Shirtery debt to it reached $320,000, of which $245,000 was paid, leaving $75,000 in unpaid debt. That $75,000 is the lower of the value of the property allegedly converted and the outstanding debt. It remains unpaid to date.

The trial court apparently believed that this amount was attorney fees and that this lawsuit "is not a proper vehicle via which to recover general damages, or attorney's fees as are sought herein." We agree with the estate that the trial court apparently mischaracterized the nature of the claim. The estate does not seek to recover attorney fees from WGC, but only to recover the outstanding balance of the debt owed by the T-Shirtery that was secured by the collateral converted. Part of that debt included a sum representing the T-Shirtery's contractual obligation to pay attorney fees incurred to recover its debt. The $75,000 is the outstanding balance on that entire debt, and as such this lawsuit *is* "a proper vehicle via which to recover" this amount, if conversion is proved. The trial court's ruling as to this

claim must be reversed.

8. Both Jay and the estate enumerate as error the trial court's denial of their motion to realign the parties to their original positions. This claim was also raised by Jay in *Cohen I*. In that case, we affirmed the trial court's refusal to realign the parties, holding that unlike the situation in *Cawthon v. Waco Fire &c. Co.*, 259 Ga. 632, 633 (386 SE2d 32) (1989), where the appellant showed an abuse of discretion by the trial court in denying its motion to realign parties, Jay had "failed to demonstrate how the realignment of the parties constituted an abuse of the trial court's discretion here." *Cohen I* at 184.

In the current appeal, the parties have demonstrated harm similar, although not identical, to that demonstrated by the appellant in *Cawthon*. In *Cawthon*, the demonstrated harm was a resultant allocation of jury strikes among parties with adverse interests. The challenged alignment in *Cawthon* gave the party representing one interest only three strikes, while "parties asserting contrary legal and factual contentions [had] nine jury strikes. [Cit.]" Id. at 634. Here, no such prejudicial allocation of jury strikes occurred. As a result of our holdings in these appeals, however, if the current alignment is maintained the estate would remain a party defendant although it has a viable claim (which we have reinstated) against WGC and no claims are pending against it. It would bear the burden of proof cast upon a plaintiff without being afforded the concomitant rights that balance that burden: making the first opening statement, presenting its case-in-chief first, and opening and closing argument.

Because the trial court's rulings also eliminated the estate's conversion claim (and all Jay's claims except attorney fees under OCGA § 13-6-11), this anomalous posture was not a factor in the trial court's ruling. We cannot, therefore, and we do not, hold that the trial court's denial of the estate's motion was an abuse of discretion. Nevertheless, since our holdings impact upon that posture, they require that the trial court be given the opportunity to reconsider its ruling on realignment. Accordingly, the trial court's "Order on Joe Cohen's and Jay Cohen's Motion to Realign the Parties" is vacated. The court is directed to rule anew on Jay's and the estate's motion to realign the parties in light of our holdings in this appeal and giving consideration to the factors set forth in *Cawthon*, supra.

*Judgment affirmed in Case No. A95A1188. Judgment affirmed in part, reversed in part, and vacated in part and remanded with direction in Case No. A95A1189. Judgment reversed in part, vacated in part, and remanded with direction in Case No. A95A1190. Birdsong, P. J., and Blackburn, J., concur. Johnson, J., disqualified.*

DECIDED NOVEMBER 28, 1995 —
RECONSIDERATION DENIED DECEMBER 20, 1995 —

*Bedford, Kirschner & Venker, Andrew R. Kirschner*, for William Goldberg & Company, Inc.

*Powell, Goldstein, Frazer & Murphy, Frank Love, Jr., Meadows, Ichter & Trigg, James D. Meadows*, for Jay Cohen.

*Byrne, Eldridge, Moore & Davis, William L. Rothschild, Branch, Pike & Ganz, Gregory J. Digel*, for Brent Cohen.