In the Matter of Troy M. LaGRONE and Wanda W. LaGrone, Debtors.

First Liberty Bank, Plaintiff,

v.

Troy M. LaGrone, Defendant.

Bankruptcy No. 97–40137.
Adversary No. 98–4005.

United States Bankruptcy Court,
S.D. Georgia,
Savannah Division.

Feb. 23, 1999.

---

Mark Bulovic, Savannah, GA, for Plaintiff.

Mr. R. Wade Gastin, Savannah, GA, for Defendant.

### MEMORANDUM AND ORDER

LAMAR W. DAVIS, Jr., Bankruptcy Judge.

Before the Court is Plaintiff First Liberty's complaint to determine the dischargeability of a debt owed by Defendant Troy LaGrone. Mr. LaGrone ("Debtor") filed a petition under Chapter 13 on January 16, 1997. Debtor converted his case to Chapter 7 on October 14, 1997. First Liberty filed a complaint on January 12, 1998, alleging that a debt arising from the disposition of its collateral is excepted from discharge by 11 U.S.C. § 523(a)(6). This adversary is a core proceeding pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(b)(2)(I). After consideration of the evidence, the briefs of the parties and applicable authorities, I make the following Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

### FINDINGS OF FACT

On January 2, 1991, Plaintiff First Liberty Bank ("First Liberty") loaned $60,000.00 to the Debtor. The Debtor executed a security interest in favor of First Liberty in a 1987 Chris Craft Stinger with two 420 horsepower Mercruiser engines. The security agreement provides that First Liberty holds an interest in the vessel and its "proceeds." (Ex. P–1). At the time of filing Debtor remained indebted to First Liberty in the amount of $59,354.58.

Debtor's testimony was uncontradicted that his purpose in borrowing the funds was to acquire and repair the vessel. Although Debtor's principal livelihood was derived from his operation of an optical lab, he had begun a side business devoted to the purchase, renovation, and sale of pleasure watercraft. It is further undisputed that Debtor took the proceeds of the First Liberty loan, substantially renovated the vessel, and placed it on the market in the Spring of 1991 with an asking price of $75,000.00. The market was unreceptive at that price, however, and he met no success for several months.

Because of his difficulty in selling the boat and because he found his ongoing monthly payment obligations to be onerous, Debtor approached or was approached by an individual by the name of "Rick Barnett" who offered to purchase the 1987 Chris Craft Stinger and a 29 foot Gulfstream boat, which Debtor also owned. Barnett offered to pay $50,000.00 for the Chris Craft boat because he allegedly had found a buyer willing to purchase it from him for $60,000.00. Barnett made a down payment of $29,000.00, of which the Debtor allocated $19,000.00 to the full purchase price for the 29 foot Gulfstream and $10,000.00 as a deposit on the 1987 Chris Craft Stinger.

Debtor did not advise First Liberty Bank that the vessel had been sold. Instead, he received the $29,000.00 from Barnett and remitted none of the proceeds to First Liberty. He did maintain for a time his monthly repayment obligations of $1,300.00, but made no lump sum payment out of the proceeds of the sale.

Not long after this transaction in the fall of 1991, Debtor's financial problems resulted in his filing a Chapter 13 case, Ch.13 No. 92–42048.[1] In his Chapter 13 plan, he proposed to surrender the vessel to First Liberty Bank and advised First Liberty that the vessel could be repossessed at a boat yard in Brunswick, Georgia, where it was being repainted by Mr. Barnett. Debtor asserted, however, that he did not know where Barnett lived or worked. First Liberty made substantial efforts to recover the vessel in 1992, including efforts to reach Barnett by telephone. At various times, the trail of telephone numbers resulted in calls to a "Barney's Coffee Shop," a marina in Fort Pierce,

---

1. He also filed a Chapter 13 in 1994, which was dismissed in March 1995, Ch.13 No. 94–40601.

Florida, and ultimately to a location in Fern Park, Florida. From that number, an individual named "Mark Bennett" called First Liberty's representative and referred First Liberty to a boat dealer in Oklahoma, who in turn suggested that the vessel might have been shipped to a purchaser in Japan.

Debtor now contends that Barnett/Bennett stole the vessel. However, Debtor never filed a police report, never filed an insurance claim, and never listed as an asset in his schedules any residual interest in the vessel or any claim against Barnett. In sum and substance, the result is that Debtor conveyed the vessel, received either $10,000.00 or $29,-000.00 in return, remitted none of the proceeds to First Liberty, and failed to advise First Liberty of the disposition of the collateral. First Liberty, despite substantial efforts on its part, has been unable to recover its collateral.

Certain payments have been applied to First Liberty's indebtedness, partly in direct payments and partly through remittances received under Debtor's previous Chapter 13 plans. First Liberty has received approximately $13,650.00. The parties stipulated the value of the collateral to be $40,000.00 as of the date of the sale and accrued interest on that sum totaled $33,981.37 on the date of trial.

## CONCLUSIONS OF LAW

Debtor contends that his actions were not willful and malicious within the meaning of 11 U.S.C. § 523(a)(6) because his transfer of possession of the vessel was without the requisite intent to cause injury. First Liberty claims that the transfer of the boat amounted to a conversion of its collateral, and that even in light of recent Supreme Court case law, conversion of collateral still constitutes a willful and malicious injury.

■■■ In an action to determine the non-dischargeability of a debt, the plaintiff bears the burden of proving by a preponderance of the evidence that a discharge is not warranted. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). While the underlying claim is determined by looking to state law, whether or not the debt is excepted from discharge is distinctly a matter of federal law governed by the terms of the Bankruptcy Code. *Grogan,* 498 U.S. at 284, 111 S.Ct. at 657–658 (*citing Brown v. Felsen,* 442 U.S. 127, 129–130, 136, 99 S.Ct. 2205, 2208–2209, 2211, 60 L.Ed.2d 767 (1979)).

■■■ First Liberty brings this complaint under 11 U.S.C. § 523(a)(6), which provides as follows:

(a) A discharge under section 727, 1141, 1228[a] 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

A debt will only be nondischargeable if it results from a deliberate and intentional injury, not merely a deliberate or intentional act that leads to injury. *Kawaauhau v. Geiger,* 523 U.S. 57, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998). Debts excepted from discharge under Section 523(a)(6) are in the category of "intentional torts." *Id.*

■■■ Long-standing Supreme Court precedent supports a finding that conversion of a creditor's property can amount to a willful and malicious injury. Where a debtor "deprives another of his property forever by deliberately disposing of it without semblance of authority," he causes an injury to property of the creditor. *McIntyre v. Kavanaugh,* 242 U.S. 138, 141, 37 S.Ct. 38, 39, 61 L.Ed. 205 (1916). This act of conversion is an intentional injury as contemplated by the exception to discharge. *Id.*[2] Not all acts of conversion are excepted from discharge, however. Where the interference with the creditor's interests in property is negligent or reckless, the Supreme Court has noted

---

**2.** Under state law, conversion of another's property is defined as "[a]ny distinct act of dominion wrongfully asserted over another's property in denial of his right or inconsistent with." *Bromley v. Bromley,* 106 Ga.App. 606, 610, 127 S.E.2d 836, 839–840 (1962). Conversion is a tort for which punitive damages may be recovered, O.C.G.A. §§ 15–10–1, 15–10–6, 15–12–5.1; *see also Privitera v. Addison,* 190 Ga.App. 102, 104, 378 S.E.2d 312, 315 (1989), *cert. denied,* (March 2, 1989).

that such acts are insufficient to establish a willful and malicious injury. *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 332, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934).

The Court's holdings on conversion as a basis for excepting a debt from discharge survive its more recent holding on Section 523(a)(6). The unanimous *Kawaauhau* Court, while narrowing the scope of Section 523(a)(6) in a medical malpractice case, specifically reaffirmed previous Supreme Court case law on conversion debts in bankruptcy. *Id.* at 978 ("[D]ecisions of this Court are in accord with our construction") (*citing McIntyre* and *Davis* ).

Conversion of a creditor's property can therefore constitute a "willful and malicious injury" and render the debt nondischargeable pursuant to 11 U.S.C. § 523(a)(6), *see McIntyre*, 37 S.Ct. at 39, so long as both the act and the injury can be found to be "deliberate" and "intentional" as required by *Kawaauhau*, 118 S.Ct. at 977.

■ The crux of the matter is whether the act was deliberate, as opposed to accidental, and whether the debtor intended the consequences of the act, i.e., to deprive the creditor of its lawful exercise of rights in the collateral or its proceeds by disposing of or retaining it without the creditor's knowledge or consent. *See Kawaauhau*, 118 S.Ct. at 977 (*citing* Restatement (Second) of Torts § 8A, comment a, p. 15 (1964)). It is not enough that the debtor interfered with a creditor's rights in the collateral. Rather, the circumstances must demonstrate that the debtor intended the injury sustained by the creditor. The burden of proving that the Debtor possessed the requisite malicious intent falls on the creditor under the *Grogan* decision and that intent can be proven by showing either subjective intent to injure or an objective substantial certainty that harm would result. *See Miller v. Abrams*, 156 F.3d 598, 606 (5th Cir.1998) ("willful and malicious" is a unitary concept modifying the word "injury" and requires only an intentional and deliberate act which is actually intended or substantially certain to cause injury),

*petition for cert. filed*, 67 U.S.L.W. 3469 (1999).

■ I find that First Liberty has carried its burden of persuasion and that the Debtor did in fact willfully and maliciously intend the injury—the interference with First Liberty's collateral rights. The evidence presented to this Court does not support a finding, as in *Davis*, that a prior course of dealings with First Liberty gave Debtor a mistaken belief that releasing the collateral or retaining proceeds in this manner would be acceptable. Nor did Debtor advise First Liberty of the sale or seek its consent. In the absence of such consent or course of conduct, Debtor's conduct clearly amounts to a wrongful conversion of collateral. He transferred the vessel and received at least a $10,000.00 down payment. He knew First Liberty held an interest in the vessel, but did not remit the proceeds to the lender or seek permission to retain the proceeds. He never informed First Liberty that possession had been delivered to the purchaser and that he had received funds from that purchaser, despite the continuing security interest of First Union in the proceeds. He knew that First Liberty held a collateral interest in the vessel and its proceeds, and he knew that sale and retention of the proceeds injured that interest by depriving First Liberty of both the vessel and the funds.

Debtor's "courthouse steps" assertion that the boat was stolen is unconvincing. He failed to inform First Liberty of any theft, failed to report the "theft" to his insurance company in order to receive reimbursement for the stolen property. He thereby prevented the creditor from recovering under the policy for the "theft" of its collateral. In his entire course of conduct, Debtor repeatedly, at every turn, effectively evaded, blocked or delayed the assertion by First Liberty of its collateral rights either in the vessel, its cash proceeds, or its insurance coverage. Debtor's actions were willful and deliberate, manifested disregard for the rights of First Liberty and were substantially certain to cause injury sufficient to meet First Liberty's burden of proof under 11 U.S.C. § 523(a)(6).

*ORDER*

In light of the foregoing Findings of Fact and Conclusions of Law, it is hereby ordered that the debt owed to First Liberty by Troy LaGrone in the amount of $73,981.37, plus interest after October 28, 1998, is excepted from discharge.